CASE NO. 13-10827-B

UNITED STATES COURT OF APPEALS
ELEVENTH CIRCUIT

MELISSA R. BLOOM,

*Appellant,*

vs.

HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY,

*Appellee.*

On Appeal from the United States District Court Southern District of Florida
Case No. 9:11-cv-81393-KLR

# INITIAL BRIEF OF APPELLANT

April 30, 2013

BRENTON N. VER PLOEG
BENJAMIN C. HASSEBROCK
VER PLOEG & LUMPKIN, P.A
100 S.E. Second Street, 30th Floor
Miami, Florida 33131-2151
Tel: (305) 577-3996
Fax: (305) 577-3558

## CERTIFICATE OF INTERESTED PARTIES

Bloom, Melissa

Hartford Life and Accident Insurance Company

Hassebrock, Benjamin C., Esq.

Ryskamp, Kenneth L., Hon.

Ver Ploeg, Brenton N., Esq.

Ver Ploeg & Lumpkin, P.A.

# <u>S</u><u>TATEMENT</u> <u>R</u><u>EGARDING</u> <u>O</u><u>RAL</u> <u>A</u><u>RGUMENT</u>

Appellant Melissa Bloom respectfully requests oral argument to assist the Court in resolving the critical issues presented in this appeal. This case is fact intensive and raises important legal issues under the Employee Retirement Income Security Act of 1974, 28 U.S.C. §1001 *et seq.*, which affect all employees insured under employer-sponsored group long-term disability plans.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES .......................................................C1

STATEMENT REGARDING ORAL ARGUMENT ..................................................i

TABLE OF CONTENTS......................................................................................... ii

TABLE OF CITATIONS ......................................................................................iv

TABLE OF RECORD REFERENCES IN THE BRIEF....................................... vii

STATEMENT OF JURISDICTION..................................................................... viii

STATEMENT OF THE ISSUES............................................................................1

STATEMENT OF THE CASE................................................................................2

STATEMENT OF THE FACTS .............................................................................4

SUMMARY OF THE ARGUMENT ......................................................................8

ARGUMENT ........................................................................................................11

   I.   THE DISTRICT COURT ERRED IN DETERMINING THAT HARTFORD COULD IGNORE READILY AVAILABLE INFORMATION THAT COULD HAVE CONFIRMED BLOOM'S DISABILITY........................ 11

   II.   THE DISTRICT COURT ERRED IN FINDING A REASONABLE BASIS FOR HARTFORD'S DECISION TO TERMINATE BLOOM'S CLAIM... 16

      A.   Hartford's surveillance video is consistent with Bloom's reported condition and does not support the Company's claim decision........................17

      B.   Hartford's Medical Evidence is Primarily Based Upon the Surveillance Video and Does Not Furnish A Reasonable Basis for Hartford's Claim Decision. ..............................................................................24

      C.   Hartford's committed three critical procedural violations that denied Bloom a full and fair claim review. .................................................................31

*1.    The district court erred in failing to consider Hartford's premature surveillance as evidence of its bias toward terminating Bloom's claim.* ............................................................... 32

*2.    The district court erred in failing to consider Hartford's ignorance of Bloom's Social Security disability award as evidence that its decision was unreasonable.* ..................................................... 35

*3.    The district court erred in finding that Hartford's failure to advise Bloom of critical omissions from the administrative record prejudiced Bloom's claim review.* .................................................... 37

CONCLUSION ......................................................................... 39

CERTIFICATE OF COMPLIANCE ..................................................... 40

CERTIFICATE OF SERVICE ............................................................ 40

## FEDERAL CASES

*Anderson v. Unum Life Ins. Co. of Am.*,
   414 F. Supp. 2d 1079 (M.D. Ala. 2006).............................................. 14

*Beaty v. Prudential Ins. Co. of Am.*,
   313 Fed. Appx. 46 (9th Cir. 2009) ............................................... 19, 25

*Black & Decker Disability Plan v. Nord*,
   538 U.S. 822 (2003) ........................................................................ 25

*Blankenship v. Metropolitan Life Ins. Co.*,
   644 F.3d 1350 (11th Cir. 2011)............................................. 31, 32, 34

*Booton v. Lockheed Med. Benefit Plan*,
   110 F.3d 1461 (9th Cir. 1997) ......................................................... 13

*Bray v. Fort Dearboarn Life Ins. Co.*,
   312 Fed. Appx. 714 (5th Cir. 2009) ................................................. 29

*Burt v. Metropolitan Life Ins. Co.*,
   No. 1:04 CV 2376 BBM, 2005 WL 4712457 (N.D. Ga. Sep. 16, 2005)............ 31

*Cagle v. UNUM Life Ins. Co. of Am.*,
   2009 WL 995544 (E.D. Mo. 2009) .................................................... 38

*Capone v. Aetna Life Ins. Co.*,
   592 F.3d 1189 (11th Cir. 2010)................................................... 16, 17

*Curry v. Eaton Corp.*,
   400 Fed. Appx. 51 (6th Cir.2010) .................................................... 31

*Davis v. Prudential Ins. Co. of Am.*,
   No. 11 CV 13688, 2012 WL 4479165 (E.D. Mich. Sep. 28, 2012)................... 36

*Deel v. United of Omaha Life Ins. Co.*,
   No. 11-12751, 2012 WL 928349 (E.D. Mich. Feb. 27, 2012).......................... 23

*DeLisle v. Sun Life Assurance Co.*,
   558 F.3d 440 (6th Cir. 2009)............................................................ 36

*Fick v. Metropolitan Life Ins. Co.,*,
   347 F. Supp. 1271 (M.D. Fla. 2004) ................................................ 32

*Frerichs v. Hartford Life & Accident Ins. Co.*,
   875 F. Supp. 2d 923 (D. Minn. June 21, 2012).............................. 19, 27

*Gaither v. Aetna Life Ins. Co.*,
    394 F.3d 792 (10th Cir. 2004) ........................................ 8, 11, 12, 13,14,15,16,38

*Gharagozloo v. Aetna Life Ins. Co.*,
    No. 08-23349-CIV, 2009 WL 3753589 (S.D. Fla. Nov. 5, 2009) .... 25, 29, 30, 31

*Giertz–Richardson v. Hartford Life & Acc. Ins. Co.*,
    536 F.Supp.2d 1280 (M.D.Fla.2008) ............................................ 24,25

*Gilbertson v. Allied Signal, Inc.*,
    328 F.3d 625 (10th Cir.2003) ................................................... 13

*Grupo Televisa, S.A. v. Telemundo Comm. Group, Inc.*,
    485 F.3d 1233 (11th Cir. 2007) ................................................. 3

*Hobson v. Metropolitan Life Ins. Co.*,
    574 F.3d 75 (2d Cir. 2009) ...................................................... 23

*Lee v. BellSouth Telecomms., Inc.*,
    318 Fed. Appx. 829 (11th Cir. 2009) ......................................... 25, 26

*Lelu v. Hartford Life & Acc. Ins. Co.*,
    626 F.Supp.2d 1229 (M.D.Fla. 2009) ............................................ 14

*Lyncker v. Johnson & Johnson Pension Comm.*,
    505 F. Supp. 2d 1303 (M.D. Fla. 2006) ......................................... 25

*Marantz v. Permanente Med. Group, Inc. Long Term Disability Plan*,
    687 F.3d 320 (7th Cir. 2012) .................................................. 18,19

*Metropolitan Life Ins. Co. v. Glenn*,
    554 U.S. 105 (2008) ........................................................... 17

*Montour v. Hartford Life & Accident Ins. Co.*,
    588 F.3d 623 (9th Cir. 2009) ................................................. 19, 36

*Mote v. Aetna Life Ins. Co.*
502 F.3d 601 (7th Cir. 2007) .................................................... 19, 20

*Oliver v. Coca Cola Co.*,
    497 F.3d 1181 (11th Cir. 2007) ................................................. 26

*Rowell v. Aviza Tech. Health & Welfare Plan*,
    No. C 10-5656 PSG, 2012 WL 1672497 (N.D. Cal. May 14, 2012) ................. 19

*Sandoval v. Aetna Life & Cas. Inc. Co.*,
    967 F.2d 377 (10th Cir. 1992) ................................................. 13

*Schlegel v. Life Ins. Co. of N. Am.*,
    269 F. Supp. 2d 612 (E.D. Pa. 2003) ........................................... 38

*Schwalm v. Guardian Life Ins. Co. of Am.*,
  626 F.3d 299 (6th Cir. 2010) ......................................................................... 25, 26

*Toland v. McCarthy*,
  499 F.Supp. 1183 (D.Mass.1980) ....................................................................... 13

## FEDERAL STATUTES

28 U.S.C. § 1331 (2012) ......................................................................................... viii

28 U.S.C. §§ 1291 and 1294 (2012) ..................................................................... viii

28 U.S.C. §1001 et seq. (2012) .................................................................... i, viii, 2

29 U.S.C. §1104(a)(1)  (2012) .............................................................................. 11

## FEDERAL RULES

Fed. R. App. P. 4(a)(1)(A) .................................................................................. viii

Fed. R. Civ. P. 56(c) ................................................................................................ 3

## OTHER AUTHORITIES

29 C.F.R. § 503 ...................................................................................................... 34

# Table of Record References in the Brief

**Brief Page No.**                                                                                           **D.E. No.**

2.........................Complaint ................................................................... 1

2,22.....................Defendant's Motion for Summary Judgment ........................... 42

2,4,5,6,7,14.........Plaintiff's Motion for Summary Judgment .............................. 46
15,19,21,28,33,35

2,4,5,6,7,14,18....Notice of Filing Administrative Record .................................. 43
20,21,27,28,33,36

2.........................Motion to Supplement Administrative Record ......................... 51

2.........................Motion to Strike Exhibits O, V and W to Motion ................... 54

2.........................Motion to Strike Exhibit A to Response ................................. 69

2.........................Minute Entry ............................................................... 77

2,3,4,5,16,18,......Omnibus Order ...................................................................... 79
19,21,22,23,24,26,32,33,37

viii,3 ..................Final Judgment ...................................................................... 80

# STATEMENT OF JURISDICTION

## I.  Basis for the District Court's Subject Matter Jurisdiction

The district court had jurisdiction pursuant to 28 U.S.C. § 1331 because this case is governed by the Employee Retirement Income Security Act of 1974, 28 U.S.C. §1001 *et seq.* ("ERISA").

## II.  Basis for Jurisdiction in the Eleventh Circuit Court of Appeals

The district court entered Final Judgment in Hartford's favor on January 23, 2013.  D.E. 80.  This Court has jurisdiction to hear the appeal taken from the district court's final decision pursuant to 28 U.S.C. §§ 1291 and 1294.

## III.  Timeliness of Appeal

The district court granted Hartford's Motion for Summary Judgment and entered Final Judgment in the insurer's favor on January 23, 2013.  D.E. 80. Pursuant to Fed. R. App. P. 4(a)(1)(A), Bloom's Notice of Appeal was timely filed on February 20, 2013, within thirty days after entry of the Final Judgment.

## IV.  Verification of Appeal from Final Order

Bloom verifies that this appeal is taken from a final order of the United States District Court for the Southern District of Florida.

## STATEMENT OF THE ISSUES

I.      Whether the district court erred in determining that Hartford could ignore readily available information that could have confirmed Bloom's disability.

II.     Whether the district court erred in determining there was a reasonable basis for Hartford's decision to terminate Bloom's claim.

## STATEMENT OF THE CASE

### I. Nature of the Case

This is an action under the Employee Retirement Income Security Act of 1974, 28 U.S.C. §1001 *et seq.* ("ERISA"), for recovery of benefits due under an employer-sponsored group long-term disability plan.

### II. Course of Proceedings and Disposition Below

Bloom sued Hartford on December 28, 2011, seeking to overturn Hartford's June 28, 2011 termination of her long-term disability claim and recover benefits due under the Plan. D.E. 1.[1] The parties filed cross-motions for summary judgment on October 31, 2012.[2] D.E. 42, 46. Bloom also filed a motion to supplement the record, while Hartford filed two motions to strike exhibits from Bloom's summary judgment briefing. D.E. 51, 54, & 69. The district court heard oral argument on these motions on January 11, 2013. D.E. 77. On January 23, 2013, the district court entered its Omnibus Order Denying Plaintiff's Motion to Supplement the Administrative Record, Denying Defendant's Motions to Strike,

---

[1] Throughout this brief, citations to the record will appear in the following format: "D.E. [docket entry number] at [page number]." For example, page 5 of the court's order granting Hartford's motion for summary judgment would be cited as "D.E. 79 at 5." Where possible, Bloom will try to reference facts directly in the administrative record, which appears at D.E. 43-1 through 43-6.

[2] Plaintiff's motion was filed under seal and is not readily identifiable on the docket, but it appears to have been entered as D.E. 46 and will be referenced as such.

Granting Defendant's Motion for Summary Judgment, and Denying Plaintiff's Motion for Summary Judgment.  D.E. 79.  The district court then entered Final Judgment in Hartford's favor.  D.E. 80.  This timely appeal ensued.

## III.    Standard of Review

This Court reviews *de novo* the district court's grant of summary judgment, "adhering to the same legal standards that bound the District Court . . . draw[ing] all reasonable inferences that can be sustained by the record and evaluat[ing] those inferences in the light most favorable to the non-moving party." *Grupo Televisa, S.A. v. Telemundo Comm. Group, Inc.*, 485 F.3d 1233, 1240 (11th Cir. 2007); *see also* FED. R. CIV. P. 56(c).

## STATEMENT OF THE FACTS

Appellant Melissa Bloom was employed as a Speech-Language Pathologist when she suffered a stroke on March 16, 2009.  D.E. 79 at 2.  She has since suffered from a seizure disorder that causes her irregular but frequent seizures.  D.E. 43-3 at 32-33.  These seizures, which are preceded by a brief aura and therefore predictable only minutes before they occur, are incapacitating for their duration and accompanied by lingering physical and cognitive deficits.  *Id.*; D.E. 79 at 4.  Bloom's treating neurologist, Dr. Schiftan, has consistently reported that she suffers from residual effects of her stroke, including partial complex seizures, fatigue, memory loss, and right-sided weakness and numbness.  D.E. 46 at 4, ¶¶15-16.  As a result of this condition, Bloom has been disabled from her occupation since January 28, 2010.  D.E. 79 at 2.

Bloom submitted a disability claim under her employer's group long-term disability plan ("the Plan"), administered by Hartford.  *Id.* at 3.  She is entitled to receive disability benefits if unable to perform one or more "Essential Duty" of her occupation – which includes the ability to work a regularly scheduled work week – and sustains a 20% reduction in earnings.  *Id.*; D.E. 43-1 at 29.  On July 26, 2010, Hartford's clinical review confirmed that Bloom "does not have the ability to sustain a consistent work setting at any level" due to "uncontrolled seizure activity."  D.E. 43-2 at 85-86.  Hartford therefore approved Bloom's claim in

August 2010 and began paying benefits. D.E. 79 at 3. The Social Security Administration likewise approved Bloom for disability benefits. D.E. 43-1 at 80-81.

Hartford's adjuster, however, was not satisfied with the Company's clinical review and sought to "impact [the] claim" through video surveillance of Bloom, though this step was premature according to the Company's guidelines. D.E. 43-2 at 85; D.E. 46, Ex. V. Hartford observed Bloom on two consecutive days when she suffered no seizure activity, and therefore was able to pursue routine daily activities, consistent with reports that her symptoms were "hit or miss" and "vary from day to day." D.E. 79 at 3. Hartford then hired a neurologist, Dr. Grossman, to examine Bloom. D.E. 79 at 3-4. Dr. Grossman did not controvert Dr. Schiftan's diagnosis, but refused to corroborate Bloom's limitations because he felt there was a lack of objective evidence. D.E. 43-3 at 52. Dr. Grossman's opinion was dependent, in part, upon Hartford's surveillance video. *Id.*

Hartford relied on this information to abruptly terminate Bloom's benefits on June 28, 2011, claiming she no longer met the Plan's definition of disability. *Id.* at 4. Bloom submitted an administrative appeal, addressing the video surveillance and Dr. Grossman's IME. D.E. 43-3 at 30-43. Bloom's appeal also included letters from family members who observed her seizures, as well as a letter from Dr. Schiftan advising that there was in fact objective evidence of her

condition – specifically, an abnormal ambulatory EEG.  *Id.*  Hartford never obtained this EEG,[3] and violated its own claims guidelines by failing to advise Bloom that they were unable to do so.

On administrative appeal, Hartford prepared a referral for Bloom to undergo neuropsychological testing for cognitive deficits, but failed to actually request such an examination.  D.E. 46, Ex. R.  Hartford testified that, absent any formal cognitive testing in Bloom's claim file, it should have obtained this exam.  D.E. 46, Ex. V.  Instead, Hartford hired a second neurologist, Dr. Engstrand, to review Bloom's medical records.  D.E. 43-3 at 1-10.  Dr. Engstrand agreed that Bloom had suffered a cerebrovascular event, but like Dr. Grossman, could not agree with Bloom's limitations based on the surveillance video and a lack of objective evidence.  *Id.* at D.E. 43-3 at 8-9.

On October 6, 2011, Hartford upheld its benefit termination.  D.E. 43-1 at 46-55.  Hartford's letter concluded "there does not appear to be any clinical or radiographic evidence that you actually suffer from seizures," but alternatively suggested that "[e]ven if you are in fact having unpredictable seizures 1-2 times a

---

[3] It is not clear why the abnormal EEG did not appear in Dr. Schiftan's records, but it was performed by a third-party vendor who promptly provided the EEG upon Bloom's request.  Bloom then provided Hartford with the abnormal EEG during the course of this litigation, but Hartford refused to consider it part of the administrative record.  The EEG was part of the material submitted in Bloom's Motion to Supplement the Administrative Record, which the district court denied.

month, it would also be reasonable to assume your seizures would occur outside normal work hours and do not occur to the frequency that would continuously preclude you from working." *Id.* at 51. Hartford's decision letter violated Company guidelines by failing to communicate any consideration of Bloom's Social Security benefit award. D.E. 46, Ex. W.

# SUMMARY OF THE ARGUMENT

The district court's decision must be reversed for blindly endorsing Hartford's decision to omit two readily available pieces of "objective" evidence – an abnormal EEG and a neuropsychological exam – from the administrative record, while simultaneously relying on a lack of objective evidence to terminate Bloom's claim. While ERISA administrators generally have no obligation to seek out information that might support the claimant's disability, there is a limited exception – endorsed by courts in this Circuit – preventing Hartford from "shut[ting its] eyes to readily available information when the evidence in the record suggests that the information might confirm the beneficiary's theory of entitlement and when they have little or no evidence in the record to refute that theory." *Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 807 (10th Cir. 2004). The record reflects that Bloom's claim fits the mold: Hartford not only omitted this evidence from the record, but violated its own claims practices by failing to advise Bloom of its significance or omission, preventing her from supplying potentially dispositive evidence in support of her claim while relying on an absence of evidence to terminate benefits. The district court, however, failed to even consider, much less apply, the sound reasoning of *Gaither* and its progeny, and its decision must be overturned. This issue is of critical importance: the Eleventh Circuit has yet to address the boundaries of an ERISA fiduciaries responsibility to

investigate claims, and its decision here will influence the handling of claims for all employees insured under employer-sponsored group disability plans.

The district court also erred in finding Hartford's claim termination reasonable. Hartford relied upon three pieces of critically flawed evidence – surveillance video and two reports from consulting physicians. Hartford's premature decision to conduct surveillance, and its further mischaracterization of that video, foreshadowed the Company's eventual claim termination and serves as evidence that it was motivated by a conflict of interest. Neither Hartford nor the district court could identify any inconsistency between the surveillance and Bloom's reported condition and limitations, and the district court erred in finding that Hartford could reasonably rely on this evidence in terminating Bloom's claim.

The district court likewise erred in finding Hartford could rely on its own physicians' opinions while rejecting the consistent reports of Bloom's treating neurologist, Dr. Schiftan, confirming her disability. While Hartford is not required to accord special weight to Dr. Schiftan's opinion, it also cannot disregard his reliable opinion in favor of the unsupported and conclusory medical opinions it paid to obtain. The district court accepted Hartford's conclusory medical opinions without assessing their reliability, and identified no reason for preferring Hartford's medical evidence over that offered by Dr. Schiftan, who managed Bloom's care since she first presented in the hospital following her stroke.

The weight of Hartford's evidence is further compromised by its failure to conduct a full and fair review of Bloom's claim. Hartford committed three critical procedural errors – violating principles of ERISA law as well as its own claims guidelines – by prematurely authorizing surveillance, failing to consider Bloom's Social Security disability award, and electing not to advise Bloom of the critical evidence omitted from the record. The district court's decision confirmed these procedural violations but inexplicably found them to be *de minimis*. Hartford's procedural violations denied Bloom a full and fair claim review, and were sufficiently case-specific to require remand to Hartford for consideration of additional evidence.

<u>**ARGUMENT**</u>

I. **THE DISTRICT COURT ERRED IN DETERMINING THAT HARTFORD COULD IGNORE READILY AVAILABLE INFORMATION THAT COULD HAVE CONFIRMED BLOOM'S DISABILITY.**

Hartford knew there were two critical pieces of evidence – an abnormal ambulatory EEG and a neuropsychological examination - that could have confirmed Bloom's disability, yet elected to omit this evidence from the administrative record and failed to advise Bloom of its significance or its absence. The district court erred in absolving Hartford of an obligation to either secure this information or advise Bloom that it was not contained in the record. ERISA administrators must act as fiduciaries toward individual claimants and are required to "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries . . . ." 29 U.S.C. §1104(a)(1). They accordingly "cannot shut their eyes to readily available information when the evidence in the record suggests that the information might confirm the beneficiary's theory of entitlement and when they have little or no evidence in the record to refute that theory." *Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 807 (10th Cir. 2004) (overturning administrator's decision as arbitrary and capricious for failing to adequately investigate claim).

In *Gaither*, the claimant sought disability benefits after being diagnosed with multiple myeloma, and though his physical condition subsequently improved, he could not work due to use of narcotics. *Id.* 795-98. The insurer denied benefits after obtaining medical opinions rejecting the claimant's physical impairment, but failed to inquire with his employer about his drug use despite record evidence revealing the possibility of a relapse. *Id.* at 804. The claimant contended that Aetna's failure to contact the employer for this information constituted an abuse of discretion. *Id.*

The Tenth Circuit recognized that, as a general rule, "nothing in ERISA requires plan administrators to go fishing for evidence favorable to a claim when it has not been brought to their attention that such evidence exists." *Id.* at 804. The court, in fact, affirmed this rule, rejecting the notion that "the administrator must pore over the record for possible bases for disability that the claimant has not explicitly argued, or consider whether further inquiry might unearth additional evidence when the evidence in the record is sufficient to resolve the claim one way or the other." *Id.* at 807. The court nevertheless found a limited fiduciary obligation to make reasonable inquiry for information it knows to be readily available and that could support the claimant's disability. *Id.* The court therefore remanded the claim to Aetna for consideration of additional evidence. *Id.* at 809.

The court explained that this narrow rule is required in light of ERISA's goal

to create a non-adversarial forum for the resolution of claims:

> Aetna's position seems to be that as a plan fiduciary, it plays a role like that of a judge in a purely adversarial proceeding, where the parties bear almost all of the responsibility for compiling the record, and the judge bears little or no responsibility to seek clarification when the evidence suggests the possibility of a legitimate claim. The authority just cited suggests that Aetna has the wrong model. Indeed, one purpose of ERISA was "to provide a nonadversarial method of claims settlement." *Sandoval*, 967 F.2d at 382. In *Gilbertson v. Allied Signal, Inc.*, we explained what this nonadversarial process should look like:
>
>> [ERISA and its implementing regulations require] a meaningful dialogue between ERISA plan administrators and their beneficiaries. If benefits are denied ... the reason for the denial must be stated in reasonably clear language, ... [and] if the plan administrators believe that more information is needed to make a reasoned decision, they must ask for it. There is nothing extraordinary about this: it's how civilized people communicate with each other regarding important matters.
>
> 328 F.3d 625, 635 (10th Cir.2003) (emphasis added) (quoting *Booton*, 110 F.3d at 1463).
>
> While a fiduciary has a duty to protect the plan's assets against spurious claims, it also has a duty to see that those entitled to benefits receive them. It must consider the interests of deserving beneficiaries as it would its own. An ERISA fiduciary presented with a claim that a little more evidence may prove valid should seek to get to the truth of the matter. See *Toland*, 499 F.Supp. at 1193 (relying on analogous principles governing judicial review of administrative agency decisions).

*Id.* at 807-08. District courts in this Circuit have unsurprisingly approved

*Gaither's* sound reasoning, which requires only meaningful dialogue to ensure a

full exchange of evidence and a fair result.[4]  *See Lelu v. Hartford Life & Acc. Ins. Co.*, 626 F.Supp.2d 1229, 1231 (M.D.Fla. 2009); *Anderson v. Unum Life Ins. Co. of Am.*, 414 F. Supp. 2d 1079, 1107-08 (M.D. Ala. 2006).

The record demonstrates that Bloom's claim fits directly within the *Gaither* mold.  Bloom's treating neurologist, Dr. Schiftan, advised Hartford of the abnormal EEG in a letter submitted with Bloom's appeal, though he had been unable to provide the EEG itself.  D.E. 43-3 at 43.  Hartford never inquired about the EEG nor attempted to obtain it from either Bloom or Dr. Schiftan, though it was readily available.  The potential significance of this evidence is apparent in the report of Hartford's examining physician, Dr. Grossman, who acknowledged that he could agree with Dr. Schiftan's diagnosis if presented with such "objective" evidence of Bloom's seizures.  D.E. 43-3 at 49.

Hartford similarly failed to secure a neuropsychological examination to objectively measure Bloom's reported cognitive deficits.  Hartford's nurse first recognized the need for such testing early in the claim, prior to selecting a physician for Bloom's medical examination.  DE 46 at ¶30.  Hartford instead chose to conduct a standard neurological exam, which did not test for the cognitive

---

[4] Hartford's guidelines mandating the use of a perfection statement, which were violated here as discussed in Section II.C.3., *infra*, endorse the significance of *Gaither* and it progeny.

deficits comprising the essence of her claim. Though Hartford had prepared a referral form for cognitive testing, it never followed through with the exam. D.E. 46, Ex. R. Hartford conceded that it should have obtained this neuropsychological examination in the absence of formal cognitive testing, and offered no explanation for why it failed to do so. D.E. 46, Ex. V.

Hartford's decision to ignore the abnormal EEG and not conduct the neuropsychological referral was compounded by its failure to even advise Bloom that this evidence was absent from the record on which it planned to consider her claim. The fact that Hartford's termination primarily rested upon a lack of "objective" evidence in the record to support Bloom's disability reveals a rigged outcome contrary to the sound principles announced in *Gaither* and its progeny. At minimum, ERISA required Hartford to engage in a "meaningful dialogue" with Bloom regarding this evidence. Bloom, of course, could and would have supplied the abnormal EEG upon request or sought a referral for the neuropsychological testing herself if she had known of its significance and omission. The Company's unilateral decision to omit this readily available and potentially dispositive evidence from its record plainly did not produce a fair result, yet the district court, citing the general proscription against an administrator's duty to gather

information, failed to even analyze whether the *Gaither's* exception could apply.[5]

This Court should accordingly reverse the district court's decision and reinstate Bloom's benefits, or remand the claim to Hartford for consideration of additional evidence, including but not limited to the abnormal EEG and a neuropsychological exam.

## II. THE DISTRICT COURT ERRED IN FINDING A REASONABLE BASIS FOR HARTFORD'S DECISION TO TERMINATE BLOOM'S CLAIM.

This Circuit applies a six-step analysis when reviewing an ERISA administrator's benefit decision. *Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189, 1195 (11th Cir. 2010). When an administrator is granted discretion to review claims, as was Hartford, the analysis can be reduced to a single inquiry: did Hartford have a reasonable basis for terminating Bloom's benefits? *Id.* If Hartford's decision was not reasonable it must be overturned, and Bloom's benefits must be reinstated or the claim remanded to Hartford for further consideration. In evaluating the reasonableness of Hartford's benefit decision, the

---

[5] The district court suggests that, even if Hartford should have sought to obtain either of these critical pieces of evidence, such failure does not warrant a remand to Hartford for further evaluation because there is "no indication that an abnormal EEG or neuropsychological exam would provide any definitive support for Bloom's disabling condition." D.E. 79 at 27. Just pages earlier, of course, the court advised that it would not consider such supplemental medical evidence even if Bloom produced it. Claimants would never secure a remand if district courts could simultaneously require and refuse such evidence.

Court must factor in Hartford's conflict of interest as both reviewer and payor of claims.[6] *Id.* at 1195-96.

Bloom respectfully submits that the district court erred in finding Hartford's claim termination reasonable. Each of the three pieces of evidence Hartford relied upon – video surveillance, a medical examination by Dr. Grossman, and a review of medical records by Dr. Engstrand – are critically flawed, and, taken individually or collectively, cannot reasonably support Hartford's contention that Bloom does not suffer from frequent and incapacitating seizures, or that if she does, it presumes that such seizures are conveniently limited to times that would permit her to work a regularly scheduled week. The paucity of Hartford's evidence must be viewed in conjunction with its three critical procedural violations, which reflect that the Company was motivated by its conflict of interest in terminating Bloom's claim.

### A. Hartford's surveillance video is consistent with Bloom's reported condition and does not support the Company's claim decision.

Hartford initially approved Bloom's claim in August 2010, after its own nurse concluded Bloom's "[m]edical records support that [her] seizure activity is not yet controlled," that Bloom's "symptoms are frequently associated with post

---

[6] This is a modification to the Eleventh Circuit's traditional six-step analysis that followed in the wake of the Supreme Court's decision in *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008), which rejected a uniform heightened arbitrary and capricious standard in favor of an individualized inquiry. *Capone*, 592 F.3d at 1195.

seizure activity, likely affecting memory loss and fatigue," and that Bloom "does not have the ability to sustain a consistent work setting at any level" due to "uncontrolled seizure activity." D.E. 43-2 at 85-86. Hartford's adjuster, however, unsatisfied with the results, ordered video surveillance. The claim notes reflected the animus: he was "refer[ring the] claim to [the Special Investigations Unit] to *see if they can impact claim*." D.E. 43-2 at 85 (emphasis added). The decision to pursue surveillance, premature according to the Company's own claims guidelines,[7] is critical because it poisoned the remainder of Hartford's review and foreshadowed the Company's eventual claim termination based on the absence of seizures over a period of observation not inconsistent with its claimant's own advice.

Hartford's bias is further reflected in its interpretation of the video surveillance, which cannot reasonably support Hartford's claim decision because Bloom's observed activities do not conflict with her condition or reported limitations. As the district court recognized: "Surveillance evidence is of limited utility, the cases tell us, when the recorded data does not conflict with the applicant's self reports of limitations." D.E. 79 at 14 (quoting *Marantz v. Permanente Med. Group, Inc. Long Term Disability Plan*, 687 F.3d 320, 329 (7th

_____

[7] Hartford's guidelines concerning surveillance are discussed at Section, C.I., *infra*.

Cir. 2012)); *see also Beaty v. Prudential Ins. Co. of Am.*, 313 Fed. Appx. 46, 49 (9th Cir. 2009) (clear error where district court drew "unsupportable inferences from a surveillance video and reports which show the plaintiff engaging in a variety of normal day-to-day activities"). Hartford, in fact, has frequently been cited for manipulating surveillance video into a basis for denying claims. *See, e.g., Montour v. Hartford Life & Accident Ins. Co.*, 588 F.3d 623, 633-34 (9th Cir. 2009); *Frerichs v. Hartford Life & Accident Ins. Co.*, 875 F. Supp. 2d 923, 947-49 (D. Minn. 2012); *Rowell v. Aviza Tech. Health & Welfare Plan*, No. C 10-5656 PSG, 2012 WL 1672497, at *16 (N.D. Cal. May 14, 2012) ("conclusion of Hartford's claims examiner that Rowell's activities appear to be inconsistent with his claimed limitations . . . is simply illogical").

Hartford's surveillance video captured Bloom performing routine daily activities such as driving, shopping, performing various errands and visiting with friends. D.E. 79 at 3. Such activities hardly support the conclusion that Bloom is capable of full-time work as a speech pathologist.[8] *Mote v. Aetna Life Ins. Co.*,

_____

[8] At one point, even Hartford seemed to recognize that its surveillance video was of little value when it advised Bloom in a telephone conversation that it did not rely upon the surveillance to terminate her claim. D.E. 46 at ¶40. This statement, however, is belied by the Company's interpretation of the surveillance provided in its decision letter.

502 F.3d 601, 614-15 (7th Cir. 2007) (Wood., J., concurring in part and dissenting in part) ("courts have concluded that segments of surveillance showing light physical activities by a plaintiff do not amount to a showing that she is able to manage full-time employment").  Hartford, however, relied on this surveillance in terminating benefits, suggesting her routine activity belied her condition:

> While you contend that the surveillance video is not relevant to your claim as you feel it only documented your activities on your "good days," this does not appear entirely accurate insofar as your ability to perform the observed activities would significantly question the validity of your reported impairment(s).  For example, as noted above, during two random days of surveillance, you were observed fully functional performing activities including driving for extended periods, shopping alone, conversing with others, caring for a small child, etc.  Such activities would tend to argue against the severity and frequency of your reported seizure disorder and cognitive impairment.

D.E. 43-1 at 50.  This conclusory and *ad hominem* assault displays Hartford's bias, but fails to consider the unique nature of Bloom's seizure disorder, or explain how Bloom's performance of routine daily activities when she does not experience a seizure is inconsistent with her reported condition and limitations.

Had the Company actually been interested in seeking to confirm the dishonesty of which it now accuses its insured, the mechanism would have been simple – conduct a follow-up phone interview to ask how recently she'd experienced the seizures.  It chose instead to reject this claim without a single episode of demonstrated misrepresentation.

Bloom, in fact, had consistently advised Hartford from the beginning of her

claim that her symptoms were "hit or miss" and "vary from day to day," but accompany her seizures frequent enough to preclude full-time work. D.E. 46 at ¶¶17-18. In her appeal letter, Bloom also discussed the surveillance video and how it was consistent with her activities at times that she did not suffer seizures:

> I would also like to point out that my seizures fluctuate. The intensity and quantity of seizures varies from day to day and week to week. In addition, the severity and subsequent effects of the seizures on my cognitive abilities also varies in degree, but greatly impacts my memory (both long-term and short-term) and word retrieval. This is extremely frustrating and at times makes communication very difficult for me. This is not something the video investigator would ever be able to see or accurately report, as the nature of my illness does not manifest at every moment. There is no possible way that the video surveillance (which was only conducted on two days, which happened to be good ones for me) would be able to capture a true picture of my dysfunction.

D.E. 43-3 at 33. Neither Bloom nor her treating physician ever advised that she was limited from routine activities on days she did not experience a seizure, and as the district court noted, there was no evidence that Bloom suffered a seizure on either of the days she was under surveillance. D.E. 79 at 3. There was, therefore, no inconsistency between her reported limitations and the basic activities observed during surveillance.

The district court, however, accepted Hartford's view and analyzed this evidence through the insurer's prism, finding that "the surveillance video demonstrated no objective evidence that Bloom suffered from seizures or was cognitively impaired." D.E. 79 at 15. The proper inquiry is not whether the

surveillance proves Bloom's disability, but rather, whether the surveillance can reasonably support Hartford's decision to deny benefits. ERISA, of course, does not require surreptitious video evidence of disability, and the fact that Bloom did not have a seizure while under surveillance for two consecutive days hardly permits the inference that she does not have them frequently enough to preclude regular employment. The district court, perhaps recognizing this, attempted to find an inconsistency where Hartford had found none, suggesting "the surveillance video contradicts the findings of her treating physician, Dr. Shiftan [sic], who states in his appeal letter to Hartford that Bloom suffers absence seizures almost daily." D.E. 79 at 15. This is subtly incorrect: Dr. Schiftan noted on January 24, 2011 – more than two months after the surveillance video was taken – that Bloom reported "getting absence episodes almost daily." D.E. 42 at 5, ¶13. There is no evidence in the administrative record contemporaneous with Hartford's surveillance video to suggest Bloom would not be expected to have two consecutive days without seizures. Even Dr Schiftan's later report that she had episodes "almost daily" would not foreclose this possibility enough to permit Hartford to reasonably rely on the surveillance in denying benefits. If the Company was truly interested in an accurate report, it would have authorized a longer surveillance . . . and doubtless seen just what it was seeking to avoid.

The district court also raised concern that Bloom was observed driving,[9] though this was entirely consistent with her report to Hartford that she did not drive "very far" from home and experienced auras prior to the onset of a seizure. Like Hartford, the district court cited the total distance Bloom drove during the period of surveillance without accounting for the *radius* she traveled from her home, which was never greater than eight-miles. D.E. 79 at 15. More importantly, however, Hartford literally performed no investigation with respect to Bloom's driving restrictions, and there is no evidence in the administrative record to support Hartford's conclusion, seemingly echoed by the district court, that Bloom's limited driving was either inconsistent with her disability or unsafe.

While the district court may have correctly concluded that the surveillance did not provide evidence of Bloom's disability, the surveillance also provided no

---

[9] The cases cited by the district court concerning evidence of driving in other seizure-related ERISA disability claims are inapposite, and cannot support a blanket rule that driving is inconsistent with a seizure disorder. *See Deel v. United of Omaha Life Ins. Co.*, No. 11-12751, 2012 WL 928349 (E.D. Mich. Feb. 27, 2012); *Hobson v. Metropolitan Life Ins. Co.*, 574 F.3d 75 (2d Cir. 2009). In *Deel*, the insurer was not dependent upon surveillance of the claimant's driving as a basis for denying benefits; one of the insurer's medical reviewers simply noted there was no evidence that the claimant's driving was restricted. 2012 WL 928349, at *6. There was also no evidence the claimant experienced auras prior to the onset of a seizure. In *Hobson*, not only was the insurer not dependent upon surveillance of the claimant's driving, it advised the claimant that the record was lacking evidence to show "whether [she was] having on-going seizures that are not well controlled and prevent [her] from driving or getting around," thereby providing her an opportunity to address the insurer's concerns. 574 F.3d at 87.

evidence disproving Bloom's disability, already established by Hartford's prior claim approval. The surveillance was neutral with respect to Bloom's disability, and the district court erred in holding that, taken collectively with other evidence, it could somehow morph into reasonable support for Hartford's decision:

> When taken in conjunction with the conclusions reached by Hartford's two independent physicians that Bloom was not disabled and there was no finding of cognitive impairment, however, the surveillance video becomes a reliable form of evidence contradicting Bloom's disability claim.

D.E. 79 at 15. To the contrary, neutral surveillance evidence cannot become reliable evidence in favor of Hartford's claim termination simply when viewed alongside Hartford's medical reports, especially when, as discussed below, those physicians were largely informed by and relied upon the surveillance. The district court's decision must be overturned because the video surveillance provides no reasonable basis for terminating Bloom's benefits, and Hartford's reliance on this evidence was unreasonable.

## B. Hartford's Medical Evidence is Primarily Based Upon the Surveillance Video and Does Not Furnish A Reasonable Basis for Hartford's Claim Decision.

The district court found that Hartford "was not wrong in crediting the opinions of its reviewing physicians over that of Dr. Shiftan's [sic]," recognizing the oft-cited rule that a treating physician's opinion need not be accorded special weight. D.E. 79 at 15 (citing *Giertz–Richardson v. Hartford Life & Acc. Ins. Co.*,

536 F.Supp.2d 1280, 1291 (M.D.Fla.2008)); *see also Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 831 (2003). On balance, however, an administrator also cannot "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of treating physicians." *Gharagozloo v. Aetna Life Ins. Co.*, No. 08-23349-CIV, 2009 WL 3753589, at *14 (S.D. Fla. Nov. 5, 2009); *Nord,* 538 U.S. 822, 834 (2003).

Courts in this Circuit have spoken clearly: an administrator cannot disregard the more reliable opinion of a treating physician in favor of unsupported or conclusory medical opinions it paid to obtain. *See Lee v. BellSouth Telecomms., Inc.*, 318 Fed. Appx. 829, 840 (11th Cir. 2009) (reliance on "palpably flawed peer reviews" was arbitrary and capricious); *Gharagozloo*, 2009 WL 3753589, at *21 (reliance on unsupported peer reviews was arbitrary and capricious); *Lyncker v. Johnson & Johnson Pension Comm.*, 505 F. Supp. 2d 1303, 1314 (M.D. Fla. 2006) ("Where, as here, a treating physician has consistently and repeatedly espoused a view and supported it with medical findings, the administrator may not reject it based solely on the unsupported and unreliable opinion of a reviewing physician."). As the Sixth Circuit has explained: "[T]he deferential standard of review does not mean courts should 'rubber stamp' a plan administrator's decision – a court must review the quantity and quality of the medical evidence on each side." *Schwalm v. Guardian Life Ins. Co. of Am.*, 626 F.3d 299, 308 (6th Cir.

2010).

Hartford relied on reports obtained from two neurologists it hired to opine on Bloom's condition – Dr. Grossman, who briefly examined Bloom, and Dr. Engstrand, who merely reviewed the documents Hartford provided. The district court failed to analyze the quality of these physicians' reports, and its conclusion that Hartford reasonably relied on their opinions was no more than a rubber stamp.

The district court parroted Hartford's characterization of its own medical reports as "objective" evidence, while Dr. Schiftan's reports were referenced as "subjective" evidence. To the extent the district court held this to be a proper basis for Hartford to prefer its own physicians' reports, the decision must be overturned. This Circuit has established that the consistent diagnosis and observations of a treating physician constitute objective medical evidence, especially where objective testing may not capture the claimant's disability. *Lee v. Bellsouth Telecomms, Inc.*, 318 F. Appx. 829, 837 (11th Cir. 2009) (citing *Oliver v. Coca Cola Co.*, 497 F.3d 1181 (11th Cir. 2007)) ("the consistent diagnosis of chronic pain syndrome by Lee's physicians along with the consistent observations of physical manifestations of her condition do in fact constitute objective medical evidence"). This rule must apply here; Hartford's own internal guidance on seizure disorders advises that "not all neurological seizure activity shows up on electrographic recordings." D.E. 79 at 20.

By the district court's definition, the only "objective" evidence in the record were three normal, but concededly inconclusive, electrographic recordings.[10]   A review of the reports from Hartford's physicians reveals that their opinions were not based on affirmative evidence, but rather, on a lack of "objective" evidence and review of the surveillance video.[11]   Dr. Grossman, for example, did not deny that Dr. Schiftan's diagnosis may be accurate, but cited a lack of corroboration through objective evidence:

> Unless there is objective evidence to corroborate a transient ischemic attack (TIA), or for that matter epilepsy, I believe one is unable to make a diagnosis, despite Dr. Schiftan's notes which seem to describe episodes of seizures yet lack corroborability.  I am not denying the expertise of Dr. Schiftan as a neurologist, but unless he can produce something that is more than just a history, he is going to have to make available something that is more objective.  He mentions her zoning out.  He has her on Keppra.  Since there is nothing on the MRI scan to corroborate a stroke, sometimes diffusion MRI scans can be done, which may show more information as well, but at the present time, the way things exist, the patient, I believe, has no objective evidence of epilepsy or a stroke.

D.E. 43-3 at 52.  Bloom questioned the accuracy of Dr. Grossman's report because he told her during the examination that he agreed she was disabled and would

---

[10] As discussed at Section I, *infra*, Hartford was advised there was also an abnormal ambulatory EEG, but never obtained it.

[11] The review and interpretation of surveillance video is subjective, not objective, evidence.  *Frerichs v. Hartford Life & Accident Ins. Co.*, 875 F. Supp. 2d 923, 947-49 (D. Minn. 2012) ("interpretation of this video is inherently subjective").

report the same to Hartford. Both Bloom and a companion that attended the examination advised Hartford of Dr. Grossman's statement when they discovered his report did not support Bloom's disability. D.E. 43-3 at 35, 37-38. Hartford admitted this was an unusual complaint that should have been further investigated with Dr. Grossman, but inexplicably was not. D.E. 46, Ex. V at 94:8-21.

Hartford's reviewing consultant, Dr. Engstrand, likewise offered no medical evidence other than the normal diagnostic testing to support her conclusion, but deferred to lengthy discussion of the surveillance video:

> There is no evidence of cognitive impairment. [Bloom] was seen on the video talking freely to people, her male companion, the landscape people, the vendor for the food machine, and to care for her young son and walk him to the bus and to be responsible not only to walk but to talk on the phone as well.
>
> * * *
>
> She states that she is cognitively impaired and has frequent seizures, none of which were seen on the video camera, and there is no evidence of cognitive deficits. She is able to walk. She is able to talk on the phone. She is able to care for her son. She is able to shop, make decisions, help load the car, no signs of imbalance, and there is no episodes of staring.
>
> * * *
>
> There is no episode of cognitive impairment, *i.e.*, she is able to purchase food at a vending machine, talk to the male companion, go shopping, run errands, and drive. She is able to walk freely with no physical restrictions, no episodes of staring, no episodes of zoning off.

D.E. 43-3 at 8-9. While it may not have been improper for Hartford to provide its physicians with the surveillance video, courts must reject medical opinions such as Dr. Engstrand's when they are primarily based on unreliable surveillance evidence.

*Bray v. Fort Dearboarn Life Ins. Co.*, 312 Fed. Appx. 714, 715-16 (5th Cir. 2009) (rejecting insurer's physicians' reports "because they were based only on a surveillance video depicting activity not comparable to Bray's work duties and an alleged lack of objective medical evidence supporting her complaints of pain").

Hartford's decision to terminate Bloom's claim based on this unreliable medical evidence is similar to the insurer's evidence in *Gharagozloo v. Aetna Life Ins. Co.*, No. 08-23349-CIV, 2009 WL 3753589, at *14 (S.D. Fla. Nov. 5, 2009), which concerned a claimant suffering from carpal tunnel syndrome who was denied benefits based on a lack of objective medical evidence. In *Gharagozloo*, Aetna claimed there was no objective evidence supporting a diagnosis of carpal tunnel syndrome, and its physicians latched on to a normal nerve conduction study as evidence of an incorrect diagnosis. *Id.* at *15. Aetna's own physician, however, "had conceded that [carpal tunnel syndrome] can be diagnosed in the absence of a positive nerve conduction study." *Id.* The court found that Aetna wrongly rejected the opinion of the claimant's treating physicians in favor of non-dispositive diagnostic testing:

> This is not a case where the administrator merely chose between two equally reliable but contrary opinions. Rather, Aetna disregarded the unanimous medical opinions of *five treating physicians over a ten-year period* in favor of the opinions of two reviewing physicians who relied on questionable diagnostic testing. While Aetna did not have to 'accord special weight' to the opinions of the treating physicians, it is not permitted to arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of treating physicians. The only

conceivable reason Aetna could have for crediting the opinions of the reviewing physicians over those of the treating physicians is that the reviewing physicians' opinions permitted Aetna to deny benefits.

*Id.* (citation omitted).  The court further held that Aetna's decision to favor its two medical reviews – both of which themselves relied on the inconclusive nerve conduction study – over the claimant's treating physician was arbitrary and capricious, warranting reversal.

Like *Gharagozloo*, this is not a case where Hartford "merely chose between two equally reliable but contrary opinions."[12]  *Gharagozloo*, 2009 WL 3753589, at *14.  Bloom and her treating physician consistently reported her seizure activity and cognitive impairment, and the only medical evidence to refute these diagnoses is *a lack of evidence – i.e.*, normal diagnostic testing (EEG, MRI, MRA) – that, by Hartford's own admission, is not dispositive of the existence or magnitude of Bloom's condition.  Dr. Schiftan was equally aware of this testing; he performed it, including an abnormal EEG that Hartford never obtained, and had managed Bloom's care since she first presented in the emergency room following her stroke.  Yet he continued to report evidence of Bloom's uncontrolled seizure activity,

_____

[12] Though *Gharagozloo* involved a greater number of treating physicians supporting the claim, the case is otherwise factually indistinguishable and the result here can be no different.  Bloom must not be penalized for maintaining a course of treatment with a single provider, especially where Hartford did not advise that any additional opinion – such as that of a neuropsychiatrist – might be necessary to support her claim.

consistent with Hartford's own understanding that normal diagnostic testing could fail to detect Bloom's disability.

Courts in this Circuit have recognized that "[c]ommon sense and a stream of legal precedent suggest, however, factual determinations of a treating physician are objectively more reliable." *Burt v. Metropolitan Life Ins. Co.*, No. 1:04 CV 2376 BBM, 2005 WL 4712457, at *11 (N.D. Ga. Sep. 16, 2005) (collecting cases). Other courts have similarly recognized that "giving greater weight to a non-treating physician's opinion for no apparent reason lends force to the conclusion that a plan administrator's decision is arbitrary and capricious." *Curry v. Eaton Corp.*, 400 Fed. Appx. 51, 59 (6th Cir. 2010). Neither Hartford nor the district court identified any reason for preferring the Company's physicians over Dr. Schiftan, and none exists. As in *Gharagozloo*, the only conceivable reason Hartford could have for favoring the opinions of its physicians over Dr. Schiftan is that they permitted the termination of benefits. The district court erred in finding Hartford's claim termination to be reasonably based on this evidence, and its decision must be overturned.

## C.   Hartford's committed three critical procedural violations that denied Bloom a full and fair claim review.

This Court has recognized that an ERISA administrator's "structural conflict of interest" may have sufficient "inherent or case-specific importance" to overturn the administrator's benefit decision. *Blankenship v. Metropolitan Life Ins. Co.*,

644 F.3d 1350, 1357 (11th Cir. 2011). This inquiry should include such evidence as "whether the administrator can demonstrate the existence of a routine practice by which it reviews claims, and that it followed that routine practice in the present case." *Fick v. Metropolitan Life Ins. Co.*, 347 F. Supp. 1271, 1286 (M.D. Fla. 2004) (citation omitted).

The district court found that Hartford failed to comply with its own internal guidelines, but erred in determining that these procedural violations "did not deprive Bloom of a full and fair review of her claim such that Hartford's decision to terminate her benefits was unreasonable." D.E. 79 at 23. To the contrary, the evidence establishes that Hartford committed three fundamental errors in its review, demonstrating that the Company was motivated by its conflict of interest in terminating Bloom's claim. Unlike *Blankenship*, these specific procedural violations, viewed in conjunction with the unreliable evidence Hartford offered to support its claim decision, compels the conclusion that Hartford's conflict of interest has "sufficient inherent or case-specific importance" to overturn its benefit decision.

> 1. *The district court erred in failing to consider Hartford's premature surveillance as evidence of its bias toward terminating Bloom's claim.*

Hartford's claims manual provides that "[s]urveillance should be conducted only if there are no other means to confirm the claimant's activities and only after

conducting an appropriate pre-surveillance investigation," and Hartford testified that a pre-surveillance investigation means "don't do surveillance as the first step." D.E. 46, Ex. V. Hartford, however, elected surveillance at the outset, even after the Company approved benefits based on a clinical review finding sufficient medical evidence supporting Bloom's condition. Hartford's adjuster even revealed the game – he was "refer[ring the] claim to [the Special Investigations Unit] to *see if they can impact claim*." D.E. 43-2 at 85 (emphasis added).

The district court found that "Hartford failed to abide by its internal policies by referring Bloom's claim for surveillance prior to some type of pre-surveillance investigation." D.E. 79 at 25. The surveillance, though it was not inconsistent with Bloom's reported condition, ultimately railroaded Bloom's claim toward termination after being creatively interpreted to construe the absence of evidence as evidence of absence, and then provided to both of Hartford's physician consultants to inform their opinions. The district court, however, imparted no bias upon the adjuster's desire to "impact" the claim, but instead furnished additional speculation about potentially valid reasons for Hartford to ignore its own guidelines, suspecting it may have "concluded that because Bloom's claims were entirely subjective, that other typical, pre-investigative procedures were futile . . . [or] that surveillance was the best method to verify her claim and condition." D.E. 79 at 25.

There is simply no justification for the district court to speculate about whether there were innocent reasons for Hartford to flaunt its guidelines when, properly considered, the evidence plainly reflects a motivation to develop evidence intended to support denial. "[D]eference is due both for the administrator's plan interpretations and for his factual determinations," not evidence regarding its conflict of interest. *Blankenship v. Metropolitan Life Ins. Co.*, 644 F.3d 1350, 1355 n.6 (11th Cir. 2011).

As the district court recognized, Hartford has an obligation to establish and maintain reasonable procedures for evaluating benefit claims. 29 C.F.R. § 503–1(b). Those procedures are required to "contain administrative processes and safeguards designed to ensure and to verify that benefit claim determinations are made in accordance with governing plan documents and that, where appropriate, the plan provisions have been applied consistently with respect to similarly situated claimants." *Id.* at (b)(5). Such regulations have no force if district courts can offer non-record *post hoc* rationalizations for insurers' decisions to disregard guidelines specifically implemented to ensure claimants are evaluated consistently. The district court should have weighed the significance of Hartford's premature surveillance as evidence of its bias.

2.    *The district court erred in failing to consider Hartford's ignorance of Bloom's Social Security disability award as evidence that its decision was unreasonable.*

Hartford's claims manual requires the consideration of a claimant's Social Security Disability (SSD) award and, if benefits are terminated, further requires that specific language be incorporated into the termination letter acknowledging that the SSD award was properly considered.  D.E. 46, Ex. W.  As Hartford acknowledged, the required language "is important for the claimant to understand that we did consider that factor but that the two programs are different so it is possible to qualify for one but not the other."  D.E. 46, Ex. V.  Hartford failed to include the required language in Bloom's benefit termination letter, and there is no evidence that Hartford properly considered Bloom's SSD award as evidence confirming her disability.

The district court improperly reasoned that Hartford's failure to distinguish the SSD award was meaningless because the SSA employs a different standard for disability than that contained in Hartford's plan.  True, of course, but only in the sense that SSD standards are far more exacting than Hartford's.  While an SSD award is not dispositive of an ERISA administrator's determination, it is evidence of disability, and the prevailing view is that an administrator's failure to distinguish an SSD award is evidence that its decision was unreasonable.  As one court has explained, "although there is no technical requirement to explicitly distinguish a

favorable Social Security determination in every case, '[i]f the plan administrator (1) encourages the applicant to apply for Social Security disability payments; (2) financially benefits from the applicant's receipt of Social Security; and then (3) fails to explain why it is taking a position different from the SSA on the question of disability, the reviewing court should weigh this in favor of a finding that the decision was arbitrary and capricious.'" *Davis v. Prudential Ins. Co. of Am.*, No. 11 CV 13688, 2012 WL 4479165, * (E.D. Mich. Sep. 28, 2012) (quoting *DeLisle v. Sun Life Assurance Co.*, 558 F.3d 440, 444 (6th Cir. 2009)); *see also Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 635 (9th Cir.2009) ("While ERISA plan administrators are not bound by the SSA's determination, complete disregard for a contrary conclusion without so much as an explanation raises questions about whether an adverse benefits determination was 'the product of a principled and deliberative reasoning process.'"). Hartford met this test here. D.E. 43-1 at 80-81.

Hartford endorsed the importance of distinguishing an SSD award by including this requirement in its claims guidelines, and the Company indisputably violated that procedure in terminating Bloom's claim. The district court erred by failing to consider Hartford's ignorance of Bloom's SSD award as evidence that its decision was unreasonable.

3. *The district court erred in finding that Hartford's failure to advise Bloom of critical omissions from the administrative record prejudiced Bloom's claim review.*

As discussed in Section I., *supra*, Hartford arbitrarily elected not to secure at least two pieces of readily available objective medical evidence of Bloom's disability: an abnormal ambulatory EEG and a neuropsychological medical examination. Hartford's omission of this critical evidence was compounded by the Company's failure to comply with the very safeguard designed to ensure it obtains all relevant evidence of a claimant's disability – the "perfection statement." Hartford's claims manual mandates that any adverse decision based on a failure to obtain relevant evidence, including updated medical records, must include a statement advising the claimant of the evidence that was not obtained, thereby providing the claimant an opportunity to submit the evidence and "perfect" the claim. D.E. 79 at 26-27. Hartford did not include a perfection statement in its claim communications to Bloom, and never advised her that it had been unable to obtain the abnormal EEG or that it required objective neuropsychological testing to support her cognitive deficits.

Hartford's failure to notify Bloom of this omitted evidence was not only an arbitrary violation of Hartford's own claims practices, but prejudicial to Bloom's claim, as she lost the opportunity to submit this critical evidence for Hartford's consideration during the claims process. Courts have recognized the importance of

notifying a claimant when the insurer is aware of significant evidence missing from the record. *Cagle v. UNUM Life Ins. Co. of Am.*, No. 1:07 CV 157 SNLJ, 2009 WL 995544, at *18 (E.D. Mo. Apr. 13, 2009) ("Plaintiff was put on notice several times of what she needed to provide to substantiate her claim as required under the Plan."); *Schlegel v. Life Ins. Co. of N. Am.*, 269 F. Supp. 2d 612, 626 (E.D. Pa. 2003) ("An examination of the record also reveals that Schlegel was given specific explanations of the deficiencies in the record, and, thus, an opportunity to correct them on appeal.").

Hartford's decision to require use of a "perfection statement" in its guidelines not only reflects its understanding that ERISA requires a "meaningful dialogue," as announced in *Gaither* and discussed in Section I., *supra*, but it is also sensible policy: claimants are generally not in possession of their medical records and will likely be unaware if their physicians fail to transmit certain information or if the carrier is lacking documentation in support of the claim. Hartford's failure to include a perfection statement in its correspondence prejudiced Bloom by preventing her from fully supporting her claim, and the district court erred by failing to consider this procedural violation as further evidence that Hartford's claim decision was unreasonable.

# CONCLUSION

As set forth herein, there are five discrete issues that require reversal of the district court's decision granting Hartford summary judgment. The district court erred in permitting Hartford to deny this claim based on a lack of objective evidence when the Company simultaneously omitted readily available objective evidence of Bloom's disability from its review, then failed to advise Bloom of the significance of this evidence or its omission. The district court erred in finding that Hartford could reasonably rely on its surveillance evidence to terminate Bloom's claim when there was no inconsistency between Bloom's activities observed during surveillance and her reported condition and limitations. In addition, each of Hartford's three procedural violations - premature surveillance, failure to distinguish the SSD award, and failure to issue a "perfection statement" advising Bloom of critical omissions from the record - establish that Bloom did not receive a full and fair claim review. The district court erred in dismissing these procedural violations as *de minimis*, and should have considered each as further evidence of an unreasonable claim termination motivated by the Company's conflict of interest. For these reasons, we respectfully submit that the district court's order be reversed, and that this case be remanded for the reinstatement of Bloom's benefits, or alternatively, for remand to Hartford so that Bloom can submit additional evidence and obtain the full and fair claim review to which she is entitled.

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation set forth in FRAP 32(a)(7)(B). This brief contains 9096 words.

Respectfully Submitted,

**VER PLOEG & LUMPKIN, P.A.**
100 S.E. Second Street, 30th Floor
Miami, FL 33131
(305) 577-3996
(305) 577-3558 *facsimile*


s/ Benjamin C. Hassebrock
**BRENTON N. VER PLOEG**
Florida Bar No. 171470
**BENJAMIN C. HASSEBROCK**
Florida Bar No. 76504
*Counsel for Appellant, Melissa R. Bloom*


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished by CM/ECF and U.S. Mail this 30th day of April, 2013 to: William J. Gallwey, III, Esq., Jonathan Fordin, Esq., and Jerel C. Dawson, Esq., Shutts & Bowen, LLP, 201 South Biscayne Blvd., Suite 1500, Miami, FL 33131.


s/ Benjamin C. Hassebrock
**BENJAMIN C. HASSEBROCK**