UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

APPEAL NO. 13-10827-B
_____

MELISSA R. BLOOM,

Appellant,

v.

HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY,

Appellee.

_____

**CORRECTED APPELLEE'S BRIEF**
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 9:11-CV-81393-KLR
_____

SHUTTS & BOWEN LLP
Attorneys for Appellee
WILLIAM J. GALLWEY, III, ESQ.
JONATHAN M. FORDIN, ESQ.
JEREL C. DAWSON, ESQ.
1500 Miami Center
201 South Biscayne Boulevard
Miami, Florida 33131
Telephone (305) 358-6300
Fax (305) 381-9982

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1-2, Appellee's counsel certifies that the following individuals and entities have an interest in the outcome of this appeal:

Dawson, Jerel C., Esq.

Fordin, Jonathan M., Esq.

Gallwey, III, William J., Esq.

The Hartford Financial Services Group, Inc. (HIG) is a publicly traded corporation that has no parent corporation. No publicly held corporation currently owns 10% or more of its common stock.

Shutts & Bowen LLP

s./Jerel C. Dawson
Jerel Dawson, Counsel for Appellee

## STATEMENT REGARDING ORAL ARGUMENT

Appellee does not believe that oral argument is necessary to aid the Court in the disposition of this appeal.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE

DISCLOSURE STATEMENT...........................................................C1 of 1

STATEMENT REGARDING ORAL ARGUMENT ..............................................i

TABLE OF CONTENTS......................................................................... ii

TABLE OF CITATIONS ......................................................................v

TABLE OF RECORD REFERENCES IN THE BRIEF.........................................xi

STATEMENT OF THE CASE ................................................................1

SUMMARY OF THE ARGUMENT ....................................................13

ARGUMENT AND CITATIONS OF AUTHORITY .........................................16

I.      Applicable Legal Standards Under ERISA ....................................17

II.     Bloom Concedes that the Record Does Not Establish Her

        Claimed Disability, thus Demonstrating that Summary

        Judgment was Properly Entered Because the Benefits Decision

        was Not "Wrong." ........................................................18

III.    Hartford Life's Decision Was Not Arbitrary and Capricious .....................20

        A.      Bloom's Claim Was Entirely Subjective in Nature ..........................21

        B.      Hartford Life's Reliance on Surveillance Evidence Was Not

                Unreasonable .......................................................25

C.     Hartford Life's Reliance on the Independent Consulting and Examining Physicians Was Not Unreasonable ..................................31

D.     Hartford Life's Alleged "Procedural Violations" are Unavailing to Bloom ...........................................................................36

     (1)    Hartford Life Properly Employed Surveillance After Determining that Bloom's LTD Claim was Subjective in Nature ......................................................................37

     (2)    Hartford Life's Failure to Discuss Bloom's Social Security Disability Award is Irrelevant to the Reasonableness of Hartford Life's Decision ...........................40

     (3)    No Perfection Statement Was Needed Under the Claims Manual .....................................................................42

IV.   Bloom's Alternative Request for a Remand to Hartford Life Lacks Merit ...............................................................................43

A.     The Policy Obligated Bloom to Submit Evidence Establishing Her Claimed Eligibility for Benefits, and Did Not Require Hartford Life to Create or Obtain Evidence to Support Her Claim ...............................................................................45

B.     Bloom Fails to Establish the Elements of the Three-Part *Gaither* Test ..........................................................................48

CONCLUSION ....................................................................................56

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)................................57

CERTIFICATE OF SERVICE ............................................................58

# TABLE OF CITATIONS

**Page(s)**

**CASES**

*Arnold v. Life Ins. Co. of N. Am.*,

894 F.2d 1566 (11th Cir. 1989) ..............................................................46

*Bates v. Met. Life Ins. Co.*,

2009 WL 2355834 (M.D. Ga., July 27, 2009)......................................51

*Blankenship v. Met. Life Ins. Co.*,

644 F.3d 1350 (11th Cir. 2011) ......................................................passim

*Clark v. Hartford Life and Acc. Ins. Co.*,

195 Fed.Appx. 932, 2006 WL 2623327 (11th Cir., Sept. 14, 2006).......36, 45, 46

*Corkill v. Hartford Life and Acc. Ins. Co.*,

435 F. Supp.2d 1192 (N.D. Fla. 2005) ...............................................21

*Creel v. Wachovia Corp.*,

2009 WL 179584 (11th Cir., Jan. 27, 2009)........................................22

*Davidson v. Prudential Ins. Co. of Am.*,

953 F.2d 1093 (8th Cir. 1992) ..............................................................55

*DeBenedictis v. Hartford Life and Acc. Ins. Co.*,

701 F. Supp.2d 1113 (D. Ariz. 2010) ..................................................39

*Deel v. United of Omaha Life Ins. Co.*,

    2012 WL 928349 (E.D. Mich., Feb. 27, 2012)..............................................24, 28

*DeLorenzo v. Hartford Life and Acc. Ins. Co.*,

    2006 WL 485119 (M.D. Fla., Feb. 28, 2006)..............................................25, 39

*Fourney v. Life Ins. Co. of N. Am.*,

    2010 WL 4722035 (S.D. W.Va., Nov. 15, 2010)..............................................38

*Gaither v. Aetna Life Ins. Co.*,

    394 F.3d 792 (10th Cir. 2004) .....................................................................passim

*Gharagozloo v. Aetna Life Ins. Co.*,

    2009 WL 3753589 (S.D. Fla., Nov. 5, 2009) .......................................32, 33, 34

*Giertz-Richardson v. Hartford Life and Accident Ins. Co.*,

    536 F. Supp.2d 1280 (M.D. Fla. 2008).......................................................35, 39

*Glazer v. Reliance Standard Life Ins. Co.*,

    524 F.3d 1241 (11th Cir. 2008) .......................................................18, 19, 20, 21

*Green v. Union Security Ins. Co.*,

    646 F.3d 1042 (8th Cir. 2011) ...............................................................................26

*Herman v. Met. Life Ins. Co.*,

    689 F. Supp.2d 1316 (M.D. Fla. 2010).......................................................21, 40

*Herring v. Aetna Life Ins. Co.*,

    2013 WL 1798263 (11th Cir., Apr. 29, 2013).....................................................32

*Herring v. Aetna Life Ins. Co.*,

   898 F. Supp.2d 1313 (S.D. Fla. 2012), *aff'd*, 2013 WL 1798263 (11th

   Cir., Apr. 29, 2013) ........................................................................................18

*Hilyer v. Hartford Life and Acc. Ins. Co.*,

   2011 WL 925027 (N.D. Ala., Jan. 31, 2011) ....................................................27

*Hobson v. Met. Life Ins. Co.*,

   574 F.3d 75 (2d Cir. 2009) ...............................................................................28

*Horton v. Reliance Standard Life Ins. Co.*,

   141 F.3d 1038 (11th Cir. 1998) .......................................................................20

*Hufford v. Harris Corp.*,

   322 F. Supp.2d 1345 (M.D. Fla. 2004).............................................................31

*Hunley v. Hartford Life and Acc. Ins. Co.*,

   712 F. Supp.2d 1271 (M.D. Fla. 2010)..............................................................52

*Iannello v. Hartford Life and Acc. Ins. Co.*,

   2013 WL 262235 (2d Cir., Jan. 24, 2013) ..................................................41, 42

*Johnson Controls, Inc. v. Flaherty*,

   408 Fed.Appx. 312, 2011 WL 135745 (11th Cir., Jan 18, 2011) .......................46

*Jordan v. Northrop Grumman Corp.*,

   370 F.3d 869 (9th Cir. 2003) ...........................................................................52

*Keith v. Prudential Ins. Co. of Am.*,

    347 Fed.Appx. 548, 2009 WL 3152830 (11th Cir., Oct. 2, 2009) ......................22

*Kiloh v. Hartford Life Ins. Co.*,

    2005 WL 2105957 (M.D. Fla., Aug. 31, 2005)......................................26, 39, 47

*Levinson v. Reliance Standard Life Ins. Co.*,

    245 F.3d 1321 (11th Cir. 2001) ...........................................................................55

*Lovejoy-Wilson v. Noco Motor Fuel, Inc.*,

    263 F.3d 208 (2d Cir. 2001) ..............................................................................28

*Lyncker v. Johnson & Johnson Pension Comm.*,

    505 F. Supp.2d 1303 (M.D. Fla. 2006) (Initial Br., pg. 25) ...............................34

*Mactas v. UNUM Life Ins. Co. of Am.*,

    2008 WL 2001250 (D. Colo., May 8, 2008) .......................................................37

*Muzyka v. UNUM Life Ins. Co. of Am.*,

    195 Fed.Appx. 904, 2006 WL 2613726 (11th Cir., Sept. 13, 2006)..................47

*Peters v. Hartford Life & Acc. Ins. Co.*,

    367 Fed.Appx. 69, 2010 WL 638451 .................................................................24

*Pylant v. Hartford Life and Acc. Ins. Co.*,

    497 F.3d 536 (5th Cir. 2007) ..............................................................................39

*Ray v. Sun Life & Health Ins. Co.*,

> 752 F. Supp.2d 1229 (N.D. Ala. 2010),

> *aff'd*, 443 Fed.Appx. 529, 2011 WL 2025539 (11th Cir., Oct. 21, 2011)...........55

*Richards v. Hartford Life and Acc. Ins. Co.*,

> 356 F. Supp.2d 1278 (S.D. Fla. 2004), *aff'd*, 153 Fed.Appx. 694 (11th Cir.

> 2005) ...............................................................................................................40

*Richey v. Hartford Life and Acc. Ins. Co.*,

> 608 F. Supp.2d 1306 (M.D. Fla. 2009)..............................................................31

*Roberts v. Am. Elec. Power LTD Plan*,

> 2010 WL 2854299 (S.D. W.Va., July 19, 2010) ................................................42

*Rogers v. Met. Life Ins. Co.*,

> 1993 WL 1377514 (S.D. Ohio, Jan. 14, 1993)...................................................37

*Ruiz v. Continental Cas. Co.*,

> 400 F.3d 986 (7th Cir. 2005) .............................................................................37

*Ruple v. Hartford Life and Acc. Ins. Co.*,

> 340 Fed.Appx. 604, 2009 WL 2434999 (11th Cir., Aug. 11, 2009) ..................41

*State of Ohio v. Skaggs*,

> 925 N.E.2d 676 (Ohio App. 2010) .....................................................................28

*Trantham v. Hartford Life and Acc. Ins. Co.*,

> 2010 WL 5491197 (E.D. Mich., Nov. 3, 2010)..................................................46

*Vescera v. UNUM Provident Corp.*,

    2006 WL 2992927 (D. Vt., Oct. 18, 2006)........................................................37

*Walker v. Kimberly-Clark Corp.*,

    2010 WL 611007 (N.D. Miss., Feb. 17, 2010)...................................................47

*Warren v. United Parcel Service, Inc.*,

    495 F. Supp.2d 86 (D. Me. 2007) .......................................................................28

*Watts v. BellSouth Telecommunications, Inc.*,

    218 Fed.Appx. 854, 2007 WL 542436 (11th Cir., Feb. 22, 2007) ...............22, 23

*Whatley v. CNA Ins. Co.*,

    189 F.3d 1310 (11th Cir. 1999) .........................................................................40

*Whitfield v. Lincoln Nat. Life Ins. Co.*,

    2011 WL 4607224 (N.D. Okla., Sept. 30, 2011)...................................49, 50, 55

*Wright v. Hartford Ben. Mgt. Svcs.*,

    2012 WL 1680094 (D.N.J., May 11, 2012)........................................................48

**STATUTES**

Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.*

    ("ERISA")......................................................................................................passim

Fla. Admin. Code § 15A-5.004..............................................................................28

# TABLE OF RECORD REFERENCES IN THE BRIEF

| Brief Page # | | Docket # |
|---|---|---|
| 1 | Complaint | 1 |
| 1 | Hartford's Motion for Summary Judgment | 42 |
| 1, 19, 42 | Bloom's Motion for Summary Judgment | 46 |
| 1 | Hearing on Cross Motions for Summary Judgment | 77 |
| 1,19,23,24,27,30, 35,39,43,46,50, 52,54,55 | Order denying Bloom's Motion for Summary Judgment and granting Hartford's Motion for Summary Judgment | 79 |
| 1 | Final Judgment in favor of Hartford | 80 |
| 2,3 | Policy | 12 |
| 2,3,8,9,13,20,21, 22,24,29,35,46,50 | Administrative Record, part 1 of 5 | 43-1 |
| 3,4,5,11,27,33 | Administrative Record, part 5 of 5 | 43-5 |
| 3,4,6,41 | Administrative Record, part 4 of 5 | 43-4 |
| 4,5,11,31,34,38 | Administrative Record, part 2 of 5 | 43-2 |
| 5 | Surveillance CD | |

| **Brief Page #** | | **Docket #** |
| --- | --- | --- |
| 5,6,7,8,9,10,11, 12,13,23,24,27, 30,31,32,33,34, 50,51 | Administrative Record, part 3 of 5 | 43-3 |

# STATEMENT OF THE CASE

This appeal is governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq*. ("ERISA"). Plaintiff/Appellant, Melissa R. Bloom ("Bloom"), was a participant in an employee welfare benefit plan established and maintained by her employer. Defendant/Appellee, Hartford Life and Accident Insurance Company ("Hartford Life"), was an insurer and claim administrator for the plan. Bloom brought suit in the district court to obtain judicial reversal of Hartford Life's decision to discontinue payment of long term disability ("LTD") benefits.

## Course of Proceedings and Disposition in the Court Below

Bloom commenced the district court action in the Southern District of Florida on December 28, 2011 (Doc. 1). The parties filed cross motions for summary judgment (Doc. 42, 46). On January 11, 2013, a hearing on the cross motions for summary judgment was held (Doc. 77). On January 23, 2013, the district court entered an order denying Bloom's motion for summary judgment and granting Hartford Life's motion for summary judgment (Doc. 79). Final judgment was entered in favor of Hartford Life (Doc. 80). The district court's entry of summary judgment in favor of Hartford Life was based on the court's determination that the challenged benefits decision was neither "wrong" nor "arbitrary and capricious," thus mandating affirmance under Eleventh Circuit law.

<center>**Statement of the Facts**</center>

Bloom was a participant in an employee welfare benefit plan (the "Plan") established by her employer, RehabCare Group, Inc. ("RehabCare"). As such, she had LTD coverage under a group insurance policy (the "Policy") issued by Hartford Life, which served as a claim administrator for the Plan. (Doc. 12, pg. 3, ¶¶ 11-14; Doc. 43-1, pg. 1-44.) The Policy provided Hartford Life with "full discretion and authority" to determine eligibility for benefits and construe the terms of the Policy. (Doc. 43-1, pg. 28.)

Under the Policy, LTD benefits were payable to a participant who submitted satisfactory proof of disability through and beyond the applicable elimination period. (Doc. 43-1, pg. 21, 25-26.) The Policy provided that benefits would cease if the participant ceased to be disabled or failed to submit proof of continued disability. (*Id.*, pg. 23.) All proof submitted was required to be "satisfactory" to Hartford Life. (*Id.*, pg. 26.)

Disability was defined thusly in the Policy:

> **Disability or Disabled** means You are prevented from performing one or more of the Essential Duties of:
>
> 1)    Your Occupation during the Elimination Period;
>
> 2)    Your Occupation, for the 24 month(s) following the Elimination Period….; and

<center>2</center>

3)      after that, Any Occupation.

(Doc. 43-1, pg. 29.)

"Your Occupation" was defined:

**Your Occupation** means Your Occupation as it is recognized in the general workplace. Your Occupation does not mean the specific job You are performing for a specific employer or at a specific location.

(Doc. 43-1, pg. 32.)

Prior to claiming disability, Bloom was employed by RehabCare as a Speech-Language Pathologist. According to a job description furnished by RehabCare, her duties included: (a) screening patients and conducting initial assessments; (b) contributing to interdisciplinary care plans; (c) providing therapeutic interventions; (d) evaluating patient response to treatment; (e) documenting the course of patient care; (f) providing patient and family education; and (g) participating in rehab meetings. The position's "physical requirements" were described as: (a) ability to lift/transfer patients and equipment; (b) frequent and prolonged bending, stooping, crouching, walking and standing; and (c) ability to communicate. (Doc. 43-5, pg. 68-72.)

On March 17, 2009, Bloom presented at Boca Raton Community Hospital, advising that she had experienced right-sided weakness/numbness and slurred speech while driving. (Doc. 43-4, pg. 53-55.) The claimed symptoms had resolved when she was evaluated at the hospital. (*Id.*, pg. 54.) She had no

previous history of stroke or seizure disorder. An EEG was normal. (*Id.*, pg. 55.) MRI and CT scans of the brain were negative. (*Id.*) Bloom was neurologically stable. (*Id.*) Bloom was discharged on the morning of March 20, 2009. (*Id.*)

Bloom stopped working a full nine months later in January 2010, and applied for LTD benefits six months thereafter, in June of 2010. (Doc. 43-5, 53-55.) Her application was supported by an Attending Physician's Statement ("APS") from Robert Schiftan, M.D., neurologist. (*Id.*, pg. 56-57.) Dr. Schiftan stated that he treated Bloom on a monthly basis. (*Id.*, pg. 56.) Dr. Schiftan's primary diagnosis was "late effects" from a "CVA" (cerebrovascular accident, or stroke), with a secondary diagnosis of complex partial seizures. (*Id.*) In the APS, Dr. Schiftan described subjective symptoms of complex partial seizures, fatigue, and memory loss. (*Id.*) In the spaces on the APS form for describing physical capabilities, he wrote "NA." (*Id.*, pg. 57.) He stated, however, that Bloom had a cognitive impairment due to memory deficit and dysphasia (difficulty communicating). (*Id.*)

Bloom's LTD claim was approved on August 3, 2010, with benefits effective August 6, 2010 (following the 26 week elimination period). (Doc. 43-2, pg. 1-5.)

Because there was no objective evidence of physical impairment and Plaintiff's claimed neurological impairments were based solely on her subjective

reporting as noted in Dr. Schiftan's APS, Hartford Life determined that video surveillance might assist in assessing her functionality. (Doc. 43-2, pg. 80, 85.) Video surveillance was conducted on November 29 and 30, 2010.[1] (Doc. 43-5, pg. 2-12.) On November 29, Bloom was observed to be away from her residence for most of the day, performing various errands and visiting with friends in private residences. She frequently talked on her cell phone, and she drove her vehicle a total of 52 miles. (*Id.*, pg. 4.) On November 30, she was again away from her residence for most for the day, and again used her cell phone frequently. She drove a total of 36 miles. (*Id.*)

On January 19, 2011, Bloom was interviewed in her residence by Hartford Life investigator Jose Martinez, who provided a written account of the interview. (Doc. 43-3, pg. 11-16.) Although Bloom agreed to be interviewed, she declined to give a formal disability statement, stating that her specific restrictions and limitations should be discussed with her physician. Bloom stated that she had "continued to work until she could no longer do it because at times she would experience loss of memory, and at times they would find her staring and unresponsive." (*Id.*, pg. 12.) After being shown the surveillance video, she stated that she had never told anyone that she was incapable of performing the activities

---

[1] The surveillance video is contained on a compact disc, which was filed with the district court as part of the Administrative Record. It may readily be viewed on an office computer.

seen in the video on a good day, and that the video was irrelevant to her disability claim because she had not performed any activities that pertained to her job duties. (*Id.*)

On January 24, 2011, Bloom was seen by Dr. Schiftan, who noted that Bloom reported she was "getting absence episode[s] almost daily." (Doc. 43-4, pg. 59.) Bloom advised Dr. Schiftan that she would experience "auras" when she "feels like [a] seizure is going to occur." (*Id.*) On the same date, January 24, 2011, Dr. Schiftan completed a form in connection with Bloom's Social Security disability claim. (*Id.*, pg. 60.) Asked to comment on the "frequency and severity of seizures, including hospital, office and/or emergency room visits, response to treatment, and prognosis, Dr. Schiftan stated that Bloom had "multiple seizure types including partial complex seizures and absence seizures," and that she was compliant with her medication (Keppra). (*Id*.) He further stated that Bloom was "not able to work due to the frequent seizures and her episodes of slurred speech and word finding difficulty as well as residual [right upper extremity] weakness due to her stroke." (*Id.*)

On March 18, 2011, Bloom underwent a surgical procedure for removal of a benign uterine mass at Delray Medical Center. (Doc. 43-3, pg. 88-94.) Bloom was discharged on March 20, 2011. The discharge summary's section for "Hospital Course and Significant Findings" made no mention of any past stroke, seizures,

ongoing seizure disorder or epilepsy, and indicated nothing out of the ordinary. (*Id.*, pg. 93-94.)

On May 18, 2011, an independent medical examination ("IME") was performed at Hartford Life's request by Melvin Grossman, M.D., Board Certified in Neurology. (Doc. 43-3, pg. 48-53.) The IME included a review of medical records, which Dr. Grossman summarized, in part, as follows:

> There has been a compendium of studies done. These include evaluations. The patient has had a consultation dated March 18, 2009, for hypocoagulant state. The examination at that time was normal....
>
> An MRI of the neck was normal. An MRI of the brain was normal. Electrolytes were normal. The patient had a normal EEG report as well....
>
> I have records from the office of a Dr. Schiftan, a neurologist. He diagnoses the patient with stroke and epilepsy; yet, the testing which I reviewed were all normal. I have some difficulty with corroborations for his findings, which are primarily historical only. I do not see where there is corroborative evidence, not to deny the patient's existence of her history, but based on the laboratory studies which I have seen, which exclude the possibility of neurological disturbance. Unless there is something found to be positive, such as findings on MRI scans or MRA studies or EEG studies, I am hard pressed to consider and agree with his diagnosis, which is strictly subjective....

(*Id.*, pg. 49.)

Dr. Grossman also reviewed the surveillance video, which he analyzed thusly:

> Included also were surveillance films as well which I reviewed…. [S]he was able to physically climb, lift, move, push, and handle. Her manipulative capacity was normal on both sides of the body. She was having no problems driving, it appears. The use of upper extremities was not limited, and no compromise was found…. There seem to be no other problems that I can see of a focal nature. Certainly manual dexterity is excellent, no gait or imbalance or problems using the upper extremities.

(Doc. 43-3, pg. 49.)

Describing his examination of Bloom as "neurologically normal," Dr. Grossman provided these conclusions:

> Unless there is objective evidence to corroborate a transient ischemic attack (TIA), or for that matter epilepsy, I believe one is unable to make a diagnosis, despite Dr. Schiftan's notes which seem to describe episodes of seizures yet lack of corroborability….
>
> I believe, therefore, the patient should be able to work full-time without restrictions, despite difficulty with her right side. By history though, the investigational films find that she can use the upper extremities fairly well, with no restrictions or limitations…. [T]he patient's complaints are acknowledged, but, objectively, there are no abnormalities.

(Doc. 43-3, pg. 52).

On June 1, 2011, Hartford Life sent a copy of the IME report to Dr. Schiftan, requesting his comments, but no response was received. (Doc. 43-1, pg. 77, 79.)

By letter dated June 28, 2011, Hartford Life notified Bloom of its decision to terminate benefits effective June 29, 2011.  (Doc. 43-1, pg. 67-72.)  As explained in the letter, the decision was based on a number of factors, including the surveillance video and the conclusions drawn by Dr. Grossman in his comprehensive report.

Bloom appealed the benefits termination decision by letter dated July 12, 2011.  (Doc. 43-3, pg. 32-36.)  In the appeal letter, Bloom stated that:  (a) she had never claimed physical incapacitation; (b) her disabling conditions were "seizures and cognitive deficits"; (c) her seizures and cognitive deficits varied from day to day and week to week; (d) the surveillance happened to catch her on "good days" and thus did not accurately show her dysfunction; (e) it was "fairly constant" that her seizures were preceded by auras; (f) when she experienced an aura, she would be "homebound" and avoided driving completely; (g) there were many days in which family members or friends had to assist her in caring for herself and/or her son, as she was incapable of daily functioning; (h) she tried to have someone with her when out of her home and especially when driving; (i) Hartford Life's denial letter quoted Mr. Martinez as stating that Bloom would be unable to perform the duties of her occupation due to cognitive issues (in actuality, and as the letter made clear, it was Bloom herself who said this); and (j) when Bloom had her surgery on

March 18, 2011, she had several seizures in the hospital and was kept several extra days for observation. (*Id.*)

In support of her appeal, Bloom submitted a letter from Dr. Schiftan, which stated:

> The patient was first evaluated March 17th 2009 when she presented to Boca Raton Community Hospital with slurred speech, right arm numbness and weakness. And she was found to have left cerebral infarction. She developed seizures including partial complex and absence. She is on Keppra but absence seizures still occur almost daily and partial complex seizures occur on average 1-2 times a month and are associated with dysphasia, right side weakness, confusion and she develops postictal lethargy. The patient has developed difficulties with concentrating, focusing and memory issues since her stroke.
>
> As part of evaluation of her stroke she has hypercoagulable state and found to have MTHFR coagulation abnormality and associated low B12 and elevated homocystine level. In addition, her ambulatory EEG was abnormal.
>
> Since she is having frequent seizures and has episodes of difficulty with speech and concentration she continues to be unable to work at this time. She remains disabled due to her stroke and frequent seizures.
>
> It is not possible to predict when those seizures will occur and she may have periods during the day when she can function normally but because of [the] periodic nature of the seizures she cannot hold a job at this time. I am continuing to adjust her antiepilectic medication to get the seizures under better control.

> Please reconsider your decision and continue her long-term disability benefits based on the above information.

(Doc. 43-3, pg. 43.)

Bloom also submitted several testimonial letters from friends and family members attesting to the frequency and severity of her alleged seizures and cognitive problems. (Doc. 43-5, pg. 25-30.)

Bloom's mother claimed to have witnessed a seizure following Bloom's surgery on March 18, 2011. (Doc. 43-5, pg. 27.) Bloom was said to have "blanked out" and been unresponsive for an unspecified period of time. (*Id.*) Bloom then became aware, but was unable to speak or move her right arm for several minutes. (*Id.*) According to her mother, this pattern repeated several times over the next hour, which was reported to Bloom's nurse. (*Id.*) The nurse's narrative notes from March 18, 2011 reflect that Bloom complained of petit mal seizures, and that "seizure precautions" were then taken. (Doc. 43-3, pg. 44-45.) There is no mention of any seizure being observed by a medical professional at any time during this hospitalization. (*Id.*) Nor is there any indication that Bloom was evaluated for seizures or kept in the hospital for any extra length of time as a result of the alleged seizures.

To assist Hartford Life's evaluation of Bloom's appeal, a medical records review was performed at Hartford Life's request by Beatrice Engstrand, M.D., Board Certified in Neurology. (Doc. 43-2, pg. 98-100; Doc. 43-3, pg. 1-10.) Her

review included the surveillance video.  (Doc. 43-3, pg. 6-8.)  Dr. Engstrand made

repeated attempts to consult with Dr. Schiftan, who did not return her calls.  (Doc.

43-3, pg. 8.)   In a report dated October 5, 2011, Dr. Engstrand set out her

conclusions as follows:

> Ms. Melissa Bloom is not functionally impaired or
> limited in any way.  Her neuro exam is normal.  Her
> brain MRI is normal.  Her EEG and MRA are normal.
> She did possibly have an episode of transient right-sided
> weakness, although it is unclear through the records if it
> was a TIA, CVA, or seizure activity, or a complex
> migraine.  However, there were no residuals and it was
> clinically insignificant…. [T]he claimant's condition and
> functional ability for the period of January 2010 to the
> present is excellent….   She can work an eight-hour
> workday, for five days a week, on a consistent basis
> without restrictions….   There is no evidence of side
> effects from the medications.  There is no evidence of
> cognitive impairment…..
>
> Based on my review of the information provided
> including surveillance materials, the claimant's
> subjective reports are inconsistent with the clinical
> findings.  She states that she is cognitively impaired and
> has frequent seizures, none of which were seen on the
> video camera, and there is no evidence of cognitive
> deficits.  She is able to walk.  She is able to talk on the
> phone.  She is able to take care of her son.  She is able to
> stop, make decisions, help load the car, no signs of
> imbalance, and there [are] no episodes of staring….
> There is no episode of cognitive impairment, i.e., she is
> able to purchase food at a vending machine, talk to the
> male companion [in the surveillance video], go shopping,
> run errands, and drive.  She is able to walk freely with no
> physical restrictions, no episodes of staring, no episodes
> of zoning off.  She is fully aware of her surroundings and
> there is no evidence of any activities exacerbating,

precipitating, or worsening of her symptoms. There is no adequate information to support functional restrictions or cognitive impairments….

In my opinion, there is no objective evidence of seizures. The testing is all normal and it is not clinically severe enough to put a restriction or limitation on this claimant…. There is the history of her episode of the right-sided symptoms, whether it was a TIA, CVA, or complex migraine is unclear. The treating physician … felt that it was a CVA. However, there is no evidence of a thrombus on MRI. Her MRI and testing was all normal…. There was a question of a mild hypercoagulable state, but that is clinically insignificant and able to be treated with aspirin. There is no [e]ffect on the claimant's functional or cognitive abilities and she can work an eight hour work day, 5 days a week on a continuous basis without restrictions and limitations.

(Doc. 43-3, pg. 8-9.)

By letter dated October 6, 2011, Hartford Life notified Bloom of its final decision that LTD benefits were not payable after June 28, 2011. (Doc. 43-1, pg. 46-52.) As stated in the letter, the decision was based on Dr. Engstrand's report and the evidence relied upon to make the initial termination decision.

## **SUMMARY OF THE ARGUMENT**

This is an ERISA case in which Bloom seeks to overturn Hartford Life's decision, as a claim administrator for the Plan, to discontinue payment of LTD benefits. Bloom claims to be disabled by frequent, incapacitating seizures that cause lingering cognitive deficits. She requests the reversal of Hartford Life's decision with a directive that her benefits be reinstated, or, alternatively, with a

directive that her claim be remanded to Hartford Life so that she can submit additional evidence in support of her claimed disability.

Under this Court's precedent, judicial review of Hartford Life's benefits decision must commence with an initial *de novo* review of the record that was before Hartford Life (the "Administrative Record"), in order to determine whether the decision was "wrong." Bloom has the burden of showing that the decision was "wrong" by proving that she was in fact disabled at the relevant time. If this burden is unmet, the judicial inquiry ends and Hartford Life is entitled to summary judgment.

In the Initial Brief, Bloom makes no attempt to argue that the benefits decision was wrong, instead urging the Court to omit the first stage of review entirely. Her request is impermissible under controlling precedent, which requires her to prove her claimed disability. As Bloom effectively concedes her inability to meet that burden, the judgment entered below should be affirmed.

If Bloom were somehow able to prove that Hartford Life's decision was wrong, she would next have to demonstrate that the decision was also arbitrary and capricious, meaning there was no reasonable basis for the decision. But the Administrative Record discloses multiple reasonable grounds, starting with the fact that while Bloom claimed to suffer from chronic seizures, not a single seizure was ever observed by her treating physician or any other medical professional. A

battery of tests revealed consistently normal results. In addition, Bloom was placed under surveillance for two days, during which no seizures occurred. The surveillance showed Bloom engaging in extensive driving, an activity that is starkly inconsistent with a claimed disorder characterized by frequent, incapacitating seizures.

In terminating benefits, Hartford Life relied on the medical opinions of two independent consulting neurologists, one of whom personally examined Bloom and both of whom reviewed her medical records and the surveillance video. Finding no evidence of seizures or cognitive impairment, they concurred that Bloom had no functional limitations and was fully capable of working. Under the law of ERISA, Hartford Life was entitled to rely on the consultants' medical opinions. While Bloom contends that Hartford Life should have instead credited the opinion of her treating physician that she was disabled, the treating physician's opinion was based solely on Bloom's subjective self-reports, which Hartford Life was not required to accept at face value. Moreover, the treating physician declined to respond to multiple requests by Hartford Life and the consulting physicians for further comment regarding Bloom's condition.

Pointing to three instances in which Hartford Life allegedly failed to follow guidelines set forth in its claims manual, Bloom urges reversal on that basis. Her argument should be rejected because *de minimis* procedural missteps do not suffice

to overturn a reasonably grounded ERISA benefits decision. Furthermore, the claims manual is not part of the Plan and strict adherence to its terms is therefore not required under ERISA. The manual is simply a guideline for an adjuster to utilize as needed. Finally, Hartford Life in fact complied with the manual in two of the three instances in question, with the one incident of noncompliance being wholly irrelevant to the reasonableness of the benefits decision.

Implicitly acknowledging the lack of record evidence to support her claim of disability, Bloom alternatively requests a directive that the claim be remanded to Hartford Life for further administrative proceedings in which she would be able to submit new evidence. In seeking this relief, Bloom relies solely on a non-binding case that is inapposite for a host of reasons.

## ARGUMENT AND CITATIONS OF AUTHORITY

Bloom requests that the district court's decision be reversed and that the case be remanded to the district court with directions to order the reinstatement of her LTD benefits. Initial Br., pg. 39. Alternatively, she seeks a directive that her LTD claim be remanded to Hartford Life for further administrative proceedings in which she would be permitted to submit additional evidence of her claimed disability that was not previously submitted to Hartford Life. *Id.* As demonstrated below, both of Bloom's requests lack merit, and the judgment entered by the district court should be affirmed.

# I. Applicable Legal Standards Under ERISA

In the Eleventh Circuit, ERISA benefits decisions are judicially reviewed in accordance with the following multi-step analysis, based on the record before the claim administrator at the time the decision was made:

> (1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

> (2) If the administrator's decision is in fact "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

> (3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

> (5) If there is no conflict, then end the inquiry and affirm the decision.

> (6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Blankenship v. Met. Life Ins. Co.*, 644 F.3d 1350, 1354-55 (11th Cir. 2011).

Bloom acknowledges that Hartford Life was vested with discretion in reviewing claims. Initial Br., pg. 16. Therefore, under the framework provided in *Blankenship*, Bloom has the dual burden of proving that the Administrative Record establishes that: (a) she was disabled at the time benefits were terminated, thus making Hartford Life's contrary decision "wrong"; and (b) Hartford Life's decision, in addition to being wrong, was also "arbitrary and capricious," meaning the decision lacked any reasonable basis. *Herring v. Aetna Life Ins. Co.*, 898 F. Supp.2d 1313, 1316 (S.D. Fla. 2012), *aff'd*, 2013 WL 1798263 (11th Cir., Apr. 29, 2013) (citing *Blankenship* and *Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1247 (11th Cir. 2008)). In considering whether Hartford Life's decision was arbitrary and capricious, the Court must take into account Hartford Life's structural conflict of interest (arising from its dual role as evaluator of claims and payer of benefits), but the conflict is merely one factor and the Court's "basic analysis" still focuses on "whether a reasonable basis existed for the administrator's benefits decision." *Blankenship*, 644 F.3d at 1355.

## II. Bloom Concedes that the Record Does Not Establish Her Claimed Disability, thus Demonstrating that Summary Judgment was Properly Entered Because the Benefits Decision was Not "Wrong."

In the first stage of judicial review required by this Court's precedent, the plaintiff "**bears the burden of proving that she is disabled**." *Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1246 (11th Cir. 2008) (emphasis added). If

that burden is unmet, then the administrator's decision was not "wrong," and the court ends its inquiry and enters summary judgment for the administrator. *Id.*

In the present case, the district court properly began with the first step, determining that Bloom had failed to "prove she was disabled at the time benefits were terminated." Doc. 79, pg. 14. The court therefore ruled that Hartford Life's decision was not "wrong." *Id.*

Implicitly acknowledging her failure to prove her claimed disability in the district court proceeding, Bloom blithely proposes to simply skip the first stage of review at the appellate level. Initial Br., pg. 16. According to Bloom, the multi-stage analysis required by *Blankenship* and other Eleventh Circuit authorities should be "reduced to a single inquiry" concerning whether Hartford Life had a "reasonable basis for terminating [her] benefits."[2] *Id.* The truncated review urged by Bloom must be rejected, as it is contrary to this Court's express requirement that judicial analysis must begin with an initial *de novo* review in which the plaintiff bears the burden of proving the claimed disability "based on the record before the administrator at the time its decision was made." *Glazer*, 524 F.3d at 1246.

---

[2] Bloom took a different approach in the district court action, arguing in her summary judgment motion that the benefits decision was wrong because the Administrative Record contained "ample evidence" of her disability. Doc. 46, pg. 14. She has, however, abandoned that position at the appellate stage.

Under the settled law of this Circuit, the plaintiff in an ERISA case "bears the burden of proving his entitlement to contractual benefits." *Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998). As *Horton*, *Blankenship*, and *Glazer* make clear, Bloom has the burden of affirmatively proving that she was disabled -- *i.e.*, incapable of working in her own occupation as a speech pathologist -- at the time benefits were terminated. Tellingly, she makes no attempt to meet that burden in her Initial Brief, offering instead the impermissible suggestion that the initial review be omitted. As Bloom effectively concedes that the evidence of record fails to establish her claimed disability, the district court's ruling that Hartford Life's decision was not wrong should be affirmed and judicial inquiry should end. *See Glazer*, 524 F.3d at 1247 (holding that denial of benefits was "not wrong" because plaintiff "failed to establish that she was totally disabled," and affirming summary judgment for administrator).

### III.    Hartford Life's Decision Was Not Arbitrary and Capricious.

If the Court reaches the "arbitrary and capricious" stage of review, it should conclude that Hartford Life's decision was clearly not arbitrary and capricious.

Under the terms of the Policy, LTD benefits were conditioned on the claimant's submission of proof of disability, with benefits ceasing if the claimant ceased to be disabled or failed to supply proof of continuing disability. Doc. 43-1,

pg. 21, 23, 25-26. All proof submitted was required to be "satisfactory" to Hartford Life. *Id.*, pg. 26.

Bloom contends that she was precluded from working by "frequent and incapacitating seizures" that allegedly caused lingering physical and cognitive deficits. Initial Br., pg. 4, 17. The record discloses multiple reasonable grounds for Hartford Life's determination that proof of frequent and incapacitating seizures was lacking. Indeed, it is far from clear that Bloom ever experienced seizures at all, let alone seizures of disabling frequency and severity. Accordingly, Bloom's argument that Hartford Life's decision was arbitrary and capricious should be rejected.

A.    <u>Bloom's Claim Was Entirely Subjective in Nature</u>.

In evaluating Bloom's arguments that Hartford Life's decision was arbitrary and capricious, the Court should bear in mind that Bloom's LTD claim was entirely subjective in nature. Under the law of ERISA, a claim administrator is "not required to defer to a plaintiff's subjective complaints," or to treating physicians' diagnoses that are "based almost entirely on [plaintiff's] own subjective complaints." *Corkill v. Hartford Life and Acc. Ins. Co.*, 435 F. Supp.2d 1192, 1198 (N.D. Fla. 2005). *See also Herman v. Met. Life Ins. Co.*, 689 F. Supp.2d 1316, 1326-27 (M.D. Fla. 2010) (upholding termination of benefits where plaintiff's evidence of the alleged severity of her symptoms consisted of "her

complaints memorialized in her [treating] physicians' progress notes"). It is therefore reasonable for administrators to require objective evidence of a claimed disability, especially where, as here, the plan document conditions benefits on "proof" of disability that is "satisfactory" to the administrator. Doc. 43-1, pg. 21, 25-26.

As this Court has recognized in the ERISA disability context, it is "implicit in the requirement of proof that the evidence be objective." *Watts v. BellSouth Telecommunications, Inc.*, 218 Fed.Appx. 854, 2007 WL 542436 (11th Cir., Feb. 22, 2007), **1.[3] Indeed, the "very concept of proof connotes objectivity." *Id.* (citation omitted). *See also Keith v. Prudential Ins. Co. of Am.*, 347 Fed.Appx. 548, 2009 WL 3152830 (11th Cir., Oct. 2, 2009) (it is "not unreasonable" for an administrator to require objective evidence when the administrator has "discretion to determine what it considers to be adequate 'proof' of disability") (citing *Wangenstein v. Equifax, Inc.*, 191 Fed.Appx. 905, 913-14 (11th Cir. 2006)). Even when an allegedly disabling condition is inherently subjective in nature, it is still "reasonable to expect objective medical evidence of an inability to work." *Creel v. Wachovia Corp.*, 2009 WL 179584, *9 (11th Cir., Jan. 27, 2009).

---

[3]    Pursuant to Eleventh Circuit Rule 36-2, copies of all unpublished authorities cited in this Brief are contained in an appendix at the end of the Brief.

The policy considerations underlying the necessity of objective evidence were explained cogently by this Court in *Watts*, as follows:

> The requirement that a plaintiff submit objective evidence of the impact of a diagnosed disease, illness or other condition is logical and necessary. The objective-evidence requirement promotes integrity in the application of the law. It assures claimants are treated fairly and with parity by providing that coverage decisions are not based on varying subjective expressions by claimants…. The requirement of objective evidence also promotes integrity by assuring there is corroboration for a claimant's subjective complaints, thus deterring embellished allegations of the effect of the diagnosed malady as well as deterring fraud in the claims process….

*Watts*, at **1 (citations omitted).

Here, Bloom's claim that she suffered frequent, incapacitating seizures was based entirely on her subjective self-reports. As the district court correctly observed, the treatment notes of Bloom's treating physician (Dr. Schiftan) simply repeated Bloom's "self-reported complaints." Doc. 79, pg. 17. This is confirmed in the record, as Dr. Grossman (the Board Certified consulting neurologist and independent medical examiner) specifically found that Dr. Schiftan's records were "primarily historical only" -- *i.e.*, they reflected Bloom's history as described by Bloom. Doc. 43-3, pg. 49. Dr. Schiftan's diagnosis of a seizure disorder characterized by cognitive deficits during and after seizures was therefore, in Dr. Grossman's words, "strictly subjective." *Id.*

While Bloom claimed to have chronic seizures that caused cognitive deficits, **there is no evidence that even a single seizure or any cognitive deficit was ever observed by her treating physician or any other medical professional**. As the district court specifically noted, the record contains "no reports from any medical professional actually observing a seizure occur."[4] Doc. 79, pg. 22. On appeal, Bloom does not challenge this finding by the district court, and she points to no instance in which any medical professional **ever witnessed even one of her alleged seizures or observed any cognitive deficit.** In addition, two independent, Board Certified consulting neurologists reported that a battery of medical tests disclosed no evidence of seizures, and an independent medical examination was "neurologically normal." Doc. 43-3, pg. 8-9, 49, 52. Given the complete lack of objective evidence of seizures -- let alone *frequent, incapacitating* seizures -- Hartford Life's termination of benefits was entirely reasonable. *See Peters v. Hartford Life & Acc. Ins. Co.*, 367 Fed.Appx. 69, 2010 WL 638451, **2 (11th Cir., Feb. 24, 2010) (affirming summary judgment for administrator where the "objective medical evidence [plaintiff] submitted was not sufficient for a finding of total disability"); *Deel v. United of Omaha Life Ins. Co.*, 2012 WL 928349, *6-7 (E.D. Mich., Feb. 27, 2012) (affirming termination of benefits where claimed

---

[4] In making its final decision, Hartford Life specifically noted the absence of "clinical findings" consistent with Bloom's subjective reports of frequent and incapacitating seizures. Doc. 43-1, pg. 51.

disability was based on alleged "history of stroke and seizure," and reviewing neurologist found "no objective findings to support impairment").

Dr. Schiftan's failure to observe any seizures or cognitive deficits distinguishes the instant case from authorities cited by Bloom for the proposition that the "consistent diagnosis and *observations* of a treating physician constitute objective medical evidence." Initial Br., pg. 26 (emphasis added). Hartford Life agrees that a treating physician's direct observations may constitute objective medical evidence, but here, there are no such observations in the record. Bloom's contention that Dr. Schiftan provided objective evidence of disabling seizures must therefore be rejected.

B.   Hartford Life's Reliance on Surveillance Evidence Was Not Unreasonable.

Bloom argues that Hartford Life's decision was unreasonable due to Hartford Life's reliance on two days of video surveillance, which Bloom acknowledges documented her "performing routine daily activities such as driving, shopping, performing various errands and visiting with friends." Initial Br., pg. 19. In actuality, as discussed below, the surveillance in itself provided a reasonable basis for Hartford Life's benefits decision.

The use of video surveillance to objectively document a disability claimant's functional capacity is "entirely appropriate under ERISA." *DeLorenzo v. Hartford Life and Acc. Ins. Co.*, 2006 WL 485119, *8 (M.D. Fla., Feb. 28, 2006) (citing

*Turner v. Delta Family-Care Disab. and Survivorship Plan*, 291 F.3d 1270, 1274 (11th Cir. 2002)). In addition, surveillance evidence "need not conclusively establish that a benefits claimant can work full time" in order to constitute "objective evidence upon which an ERISA plan administrator may base its claim determinations." *Green v. Union Security Ins. Co.*, 646 F.3d 1042, 1052 (8th Cir. 2011). Where, as here, a claim is based on subjective complaints, video surveillance has "great utility" for "verifying many components of the subjective self-reporting and the corresponding [medical] opinions rendered on such self-reporting." *Kiloh v. Hartford Life Ins. Co.*, 2005 WL 2105957, *13 (M.D. Fla., Aug. 31, 2005) (citation omitted).

While Bloom asserts that the video did not contradict her subjective complaints, Initial Br. at pg. 18, the surveillance evidence was in reality profoundly inconsistent with Bloom's self-reported history of frequent and incapacitating seizures. Bloom concedes that the surveillance disclosed no evidence of seizures, and indeed, she admits that she did not have a single seizure during the two days on which surveillance was conducted. Initial Br., pg. 21-22. Although Bloom maintains that two consecutive days without any seizures is consistent with a severe and chronic seizure disorder, *id.* at pg. 22, an independent, Board Certified neurologist who reviewed the surveillance video at Hartford Life's request disagreed. Dr. Engstrand specifically noted that while Bloom claimed to

have "frequent" seizures, "none … were seen on the video camera." Doc. 43-3, pg. 8.

Perhaps even more significantly, as Dr. Grossman (the independent medical examiner who also reviewed Bloom's medical records and the surveillance video) observed, the surveillance video demonstrated that Bloom had "no problems driving." Doc. 43-3, pg. 49. Dr. Engstrand also cited the fact that Bloom was "able to … drive" as evidence that no cognitive impairment was present. *Id.*, pg. 9. It is, in fact, undisputed that Bloom was observed **driving nearly 90 miles, much of the time alone, over the space of two days**. Doc. 79, pg. 3; Doc. 43-5, pg. 4.

It would be difficult to overstate the degree to which Bloom's willingness and ability to engage in frequent driving discredit her subjective claims of frequent, incapacitating seizures. Driving, as one court has recognized in the ERISA disability context, is a "dangerous activity that requires the utmost focus." *Hilyer v. Hartford Life and Acc. Ins. Co.*, 2011 WL 925027, *14 (N.D. Ala., Jan. 31, 2011). Bloom's "choice to get behind the wheel of a car" thus "belies her assertion" that her alleged condition "inhibits her ability to function." *Id.* That choice certainly belies Bloom's claim of a disabling seizure disorder. It is self-evident and beyond rational debate that any sane person suffering from frequent, incapacitating seizures would avoid driving at all times. Indeed, the driving privileges of people with seizure disorders are strictly regulated in all 50 states,

including Florida. *See, e.g.,* Fla. Admin. Code § 15A-5.004 (regulation providing that "[a]pplicants should be seizure-free for a period of two years before having the license reinstated"); *Lovejoy-Wilson v. Noco Motor Fuel, Inc.*, 263 F.3d 208, 213 (2d Cir. 2001) (recognizing New York's requirement that people with epilepsy be "seizure-free for two years in order to obtain a driver's license"); *Warren v. United Parcel Service, Inc.*, 495 F. Supp.2d 86, 89 n.1 (D. Me. 2007) (under Maine law, a person who experiences a seizure is "not permitted to drive for six months"). The reason for such restrictions is obvious: until a "sufficient period of 'seizure free' time has passed," a driver with a seizure disorder "poses a risk to others using the roadways." *State of Ohio v. Skaggs*, 925 N.E.2d 676, 681 (Ohio App. 2010).

For Bloom to drive about freely while claiming to experience frequent, incapacitating seizures simply defies reason, and her documented ability and willingness to drive on a frequent basis provide powerful support for Hartford Life's decision. *See Hobson v. Met. Life Ins. Co.*, 574 F.3d 75, 87 (2d Cir. 2009) (affirming summary judgment for administrator where plaintiff failed to show evidence of seizures that "prevent her from driving and getting around"); *Deel v. United of Omaha Life Ins. Co.*, 2012 WL 928349, *6 (E.D. Mich., Feb. 27, 2012) (upholding denial of benefits for claimed stroke/seizure disability where reviewing neurologist noted that there was "no indication the claimant's driving was ever restricted"). The Court should therefore conclude that Hartford Life was not

unreasonable in determining that Bloom's "driving for extended periods" weighed against the "severity and frequency of [Bloom's] reported seizure disorder and cognitive impairment." Doc. 43-1, pg. 50 (Hartford Life's final decision letter). Hartford Life respectfully contends that Bloom's extensive driving, in itself, provided eminently reasonable grounds for declining to credit her self-reported complaints of frequent, incapacitating seizures.

Attempting to avoid the obvious implications of her unrestricted driving, Bloom accuses Hartford Life of urging a "blanket rule that driving is inconsistent with a seizure disorder." Initial Br., pg. 23 n.9. While people with seizure disorders may be permitted to drive if they have been seizure-free for a substantial period of time, Bloom, of course, does not claim to be seizure-free. She claims to suffer from **uncontrolled seizures that frequently incapacitate her**, **even as she drives about at her pleasure**.

Although Bloom acknowledges the "total distance" that she drove during the two days of surveillance, she asserts that her driving was consistent with her alleged seizure disorder because she allegedly confined her driving to a "radius" of eight miles from her home. Initial Br., pg. 23. Her argument makes no sense, given that an incapacitating seizure eight miles from home would be just as potentially lethal (to Bloom and to the public) as one occurring ten miles from

home.  Furthermore, the alleged eight mile radius is an unsupported assertion by Bloom, who provides no record citation to substantiate it.[5]

Bloom also suggests, as she did in her administrative appeal of the benefits decision, that her seizures were preceded by "auras" which enabled her to avoid driving when a seizure was expected.  Initial Br., pg. 23; Doc. 43-3, pg. 33.  That convenient explanation is, to put it mildly, implausible.  If true, Bloom's alleged reliance on "auras" to regulate her driving would be highly dangerous to both herself and the public, as she might only need to be wrong once in order for an unanticipated seizure to cause an auto accident.  Moreover, Bloom's alleged ability to predict her seizures in time to avoid driving is inconsistent with:  (a) her treating physician's statement that it was "not possible to predict when those seizures will occur" (Doc. 43-3, pg. 43); and (b) Bloom's own statement in the Initial Brief that her alleged seizures are "predictable only minutes before they occur."  Initial Br., pg. 4.

Because the surveillance showed no evidence of seizures and instead disclosed activities that were manifestly irreconcilable with seizures of disabling frequency and severity, the Court should reject Bloom's contention that Hartford Life's reliance on the surveillance evidence was unreasonable.

---

[5]     Bloom cites only to page 15 of the district court's order, which makes no mention of any "radius."

C.    Hartford Life's Reliance on the Independent Consulting and Examining Physicians Was Not Unreasonable.

Although Dr. Schiftan maintained that Bloom was disabled, *see* Doc. 43-3 at pg. 43, ERISA claim administrators "need not accord extra respect to the opinions of a claimant's treating physicians." *Blankenship v. Met. Life Ins. Co.*, 644 F.3d 1350, 1356 (11th Cir. 2011).[6]  An administrator is therefore "entitled to rely on the opinion of a qualified medical consultant who neither treats nor examines the claimant, but instead reviews the claimant's medical records." *Richey v. Hartford Life and Acc. Ins. Co.*, 608 F. Supp.2d 1306, 1312 (M.D. Fla. 2009).  Such reliance is "entirely appropriate" even where the reviewing physician's report "rebut[s] the opinion of the treating physicians asserting claimant is disabled."  *Hufford v. Harris Corp.*, 322 F. Supp.2d 1345, 1359 (M.D. Fla. 2004).

In the present case, Bloom's medical records and the surveillance video were independently reviewed by two Board Certified neurologists:  Dr. Engstrand and Dr. Grossman.[7]  Doc. 43-2, pg. 98-100; Doc. 43-3, pg. 1-10 and 48-53.  Dr. Engstrand, whose report was in large part the basis of Hartford Life's final decision, stated unequivocally that Bloom was "not functionally impaired or

---

[6]    Bloom's contention that a treating physician's findings are inherently "more reliable" than those of a non-treating physician, Initial Br. at pg. 31, must be rejected because it is directly contrary to *Blankenship*, which is binding precedent.

[7]    Having surveillance video reviewed by a consulting physician is proper under ERISA.  *Schindler v. Met. Life Ins. Co.*, 141 F. Supp.2d 1073, 1081 (M.D. Fla. 2001).

limited in any way." Doc. 43-3, pg. 8. Concluding that Bloom was capable of full-time work "on a consistent basis without restrictions," Dr. Engstrand found "no objective evidence of seizures" and "no evidence of cognitive impairment." *Id*. Prior to that, Dr. Grossman informed Hartford Life that "objectively, there are no abnormalities," and that Bloom should be "able to work full-time without restrictions." *Id.*, pg. 52. Notably, Dr. Grossman also performed an independent medical examination ("IME") of Bloom, advising that the examination was "neurologically normal." *Id*.

Hartford Life did not act unreasonably in relying on the medical opinions of Dr. Engstrand and Dr. Grossman. *See Herring v. Aetna Life Ins. Co.*, 2013 WL 1798263, *3 (11th Cir., Apr. 29, 2013) (holding that it was "not unreasonable" for administrator to rely on the opinions of "two reviewing physicians, in conjunction with the IME").

Arguing that Hartford Life should have credited Dr. Schiftan's opinion over the opinions of Dr. Engstrand and Dr. Grossman, Bloom cites *Gharagozloo v. Aetna Life Ins. Co.*, 2009 WL 3753589 (S.D. Fla., Nov. 5, 2009). Initial Br., pg. 29-31. But the instant case is very different from *Gharagozloo*. At issue in *Gharagozloo* was whether the plaintiff had been correctly diagnosed with carpal tunnel syndrome ("CTS"). The administrator relied on the opinions of two reviewing physicians who felt that the CTS diagnosis was discredited by normal

findings on nerve conduction studies. *Gharagozloo*, at *21. The court, noting that "many doctors agree" that a normal nerve conduction study is "not dispositive as to the existence of CTS," ruled that the administrator abused its discretion in basing its denial solely on the one test, particularly in view of the fact that multiple treating and examining physicians had consistently diagnosed CTS and all concurred that the plaintiff could not perform his occupational duties. *Id.* at *24-25.

The instant case differs sharply from *Gharagozloo* in terms of the quality and quantity of the evidence before the administrator. The *Gharagozloo* plaintiff's claim was supported by the "unanimous medical opinions of *five treating physicians over a ten-year period*." *Id.* at *15 (emphasis in original). Bloom's claim, by contrast, is backed by a single treating physician, Dr. Schiftan, who began treating Bloom in March 2009 (about nine months before she ceased working). Doc. 43-5, pg. 56-57. While the *Gharagozloo* court chided the administrator for not having the plaintiff independently examined, *Gharagozloo* at *15, Hartford Life had Bloom independently examined by Dr. Grossman, the Board Certified neurologist whose examination was "neurologically normal." Doc. 43-3, pg. 52.

Unlike the medical consultants in *Gharagozloo*, the consulting physicians whose opinions were relied upon by Hartford Life in this case did not base their

opinions on the questionable interpretation of a single test. Rather, Dr. Grossman and Dr. Engstrand analyzed a body of evidence that included: (a) Dr. Schiftan's treatment notes; (b) a *variety* of normal tests and studies; and (c) the consultants' own *direct observations* of Bloom through Dr. Grossman's independent medical examination and through the surveillance video. Doc. 43-2, pg. 98-100; Doc. 43-3, pg. 1-10, 48-53. Accordingly, *Gharagozloo* is inapposite.

*Bloom* also cites *Lyncker v. Johnson & Johnson Pension Comm.*, 505 F. Supp.2d 1303 (M.D. Fla. 2006) (Initial Br., pg. 25), in which the court stated that where a treating physician has "consistently and repeatedly espoused a view and *supported it with medical findings*, the administrator may not reject it based solely on the unsupported and unreliable opinion of a reviewing physician." *Id*. at 1314 (emphasis added). Dr. Schiftan did not support his disability opinion with medical findings. His statements regarding the frequency and severity of Bloom's alleged seizures and cognitive deficits were based entirely on what she told him. *See* pg. 23-24, *supra*. Furthermore, the opinions of Dr. Engstrand and Dr. Grossman were not unsupported or unreliable. *Lyncker* is thus no help to Bloom.

Bloom's assertion that neither Hartford Life nor the district court identified any reason for crediting the opinions of the medical consultants over the opinion of Dr. Schiftan, *see* Initial Br. at pg. 31, is refuted by the record. Hartford Life's final decision letter specifically acknowledged Dr. Schiftan's opinion that Bloom was

unable to work, but noted that his opinion was based on Bloom's "self-reported symptoms," which were entitled to little weight in view of her "observed activities" and the absence of any "radiographic, neurological or clinical findings." Doc. 43-1, pg. 51. Furthermore, the district court explained exactly why the independent consultants' opinions were more reliable than that of Dr. Schiftan:

> Dr. Schiftan, Bloom's treating physician, saw her once a month, and therefore, **relied mainly on her self-complaints as a basis for his diagnosis**. To the contrary, Drs. Grossman and Engstrand considered a **whole body of evidence**, including Dr. Schiftan's treatment notes, Dr. Grossman's IME, and direct observations of Bloom via surveillance video to determine that Bloom lacked clinical support for her disorder.

Doc. 79, pg. 20-21 (emphasis added).

Bloom's subjective statements were not transformed into sufficient disability evidence under ERISA merely because they were heard and repeated by her treating physician. Claim administrators are not required to "accept all subjective complaints that a participant reported to a doctor." *Giertz-Richardson v. Hartford Life and Accident Ins. Co.*, 536 F. Supp.2d 1280, 1292 (M.D. Fla. 2008). If such acceptance were required, benefits would be "payable to any participant with subjective and effervescent symptomology simply because the symptoms were first passed through the intermediate step of self-reporting to a medical professional." *Id.* (citation omitted). The Court should conclude that Hartford Life acted

reasonably in crediting the opinions of Dr. Grossman and Dr. Engstrand over the opinion of Dr. Schiftan. *See Blankenship v. Met. Life Ins. Co.*, 644 F.3d 1350, 1356 (11th Cir. 2011) (holding that administrator acted reasonably in "relying on the independent medical opinions" and "crediting those opinions over the opinions of [plaintiff's] doctors").

D.   Hartford Life's Alleged "Procedural Violations" are Unavailing to Bloom.

Citing three "procedural violations" allegedly committed by Hartford Life during the review of her claim, Bloom argues that the alleged "violations" deprived her of a full and fair review and constitute evidence that Hartford Life's decision was influenced by its structural conflict of interest (arising from its dual role as evaluator of claims and payer of benefits). Initial Br., pg. 31-39. Notably, Bloom does not contend that any of the three alleged acts or omissions violated any provision of ERISA or its implementing federal regulations. Rather, she argues that Hartford Life failed to follow guidelines set forth in its claims manual. Hartford Life's duties and obligations with respect to the Plan are established not by the claims manual, however, but by the Policy.

As this Court has recognized, ERISA plans are to be administered and benefits paid "in accordance with plan documents." *Clark v. Hartford Life and Acc. Ins. Co.*, 195 Fed.Appx. 932, 2006 WL 2623327 (11th Cir., Sept. 14, 2006), **2 (citing *Egelhoff v. Egelhoff*, 532 U.S. 141, 150, 121 S.Ct. 1322 (2001)).

Where, as here, plan benefits are provided through an insurance policy, the policy is a plan document. *Ruiz v. Continental Cas. Co.*, 400 F.3d 986, 990-91 (7th Cir. 2005). A claims manual, by contrast, is "not a part of the plan" and is thus "not binding" on anyone. *Rogers v. Met. Life Ins. Co.*, 1993 WL 1377514, *8 (S.D. Ohio, Jan. 14, 1993). *See also Mactas v. UNUM Life Ins. Co. of Am.*, 2008 WL 2001250, *5 (D. Colo., May 8, 2008) (ruling that whether claims manual "guided the internal decision-making of [administrator's] claims adjusters" was "immaterial" in an ERISA case, because the manual was "not part of the disability policy" and there was "no provision in the disability policy that incorporates or refers to the claims manual"). Accordingly, Bloom's argument that Hartford Life's "alleged noncompliance with its Claims Manual" shows the "arbitrary and capricious nature of [its] decision" should be rejected as "unpersuasive." *Vescera v. UNUM Provident Corp.*, 2006 WL 2992927, *8 (D. Vt., Oct. 18, 2006).

Moreover, as demonstrated below, Hartford Life did *not* in fact deviate from the claims manual in two of the three instances cited by Bloom, and the one instance where it deviated from the manual had no relevance to the reasonableness of the benefits decision.

> (1) *Hartford Life Properly Employed Surveillance After Determining that Bloom's LTD Claim was Subjective in Nature.*

Bloom contends that Hartford Life's decision to use surveillance was "premature" because the claims manual provides that surveillance should follow an

appropriate "pre-surveillance investigation," which she asserts was not performed. Initial Br., pg. 32-33. She also purports to see something sinister in a Hartford Life analyst's statement that her claim was being referred to the company's Special Investigations Unit ("SIU") to see if the SIU could "impact [the] claim." *Id.*, pg. 33.

Hartford Life's reason for employing surveillance is expressly stated in the Administrative Record. The analyst who referred Bloom's claim to the SIU did so because the allegedly disabling condition appeared to be "based solely on [Bloom's] subj[ective] complaints of seizures." Doc. 43-2, pg. 85. Surveillance, as courts applying ERISA have recognized, is "useful in determining the veracity of a claimant's subjective complaints." *Fourney v. Life Ins. Co. of N. Am.*, 2010 WL 4722035, *12 (S.D. W.Va., Nov. 15, 2010). Hartford Life's pre-surveillance investigation consisted of reviewing the evidence supporting Bloom's claim and correctly determining that it was subjective, after which Hartford Life quite appropriately referred the claim for investigation. Bloom cites no authority suggesting that an administrator acts unreasonably by employing surveillance to verify a claimant's subjective complaints.

As for the Hartford Life analyst's statement that an investigation could "impact [the] claim," Bloom's accusations of nefarious intent are fanciful. Surveillance can "impact" a claim by contradicting a claimant's subjective

complaints, *or* by confirming them. Had the surveillance of Bloom disclosed any behavior consistent with seizures, that would have "impacted" the claim by providing evidence that she indeed suffered from seizures. Bloom's contention that Hartford Life's employment of surveillance demonstrates bias is meritless.

Asserting that Hartford Life has "frequently been cited for manipulating surveillance video into a basis for denying claims," Bloom cites three cases from outside the Eleventh Circuit in which the courts took issue with Hartford Life's interpretation of surveillance evidence. Initial Br., pg. 19. Bloom mischaracterizes the cited cases, none of which states that Hartford Life "manipulated" anything. Moreover, Hartford Life could easily cite scores of ERISA cases (including multiple cases within this Circuit) in which its use of surveillance evidence to inform its claim decisions has met with judicial approval. *See, e.g.*, *DeLorenzo*, *supra* pg. 25, at *8; *Kiloh*, *supra* pg. 26, at *11-12; *Giertz-Richardson*, *supra* pg. 35, at 1292; *Pylant v. Hartford Life and Acc. Ins. Co.*, 497 F.3d 536, 540 (5th Cir. 2007); *DeBenedictis v. Hartford Life and Acc. Ins. Co.*, 701 F. Supp.2d 1113, 1126-27 (D. Ariz. 2010).

In this case, the district court found that the surveillance video showed Bloom appearing "completely normal" and "capable of performing high-functioning tasks, such as driving." Doc. 79, pg. 19. Indeed, it showed her driving "almost 90 miles in two days." *Id*., pg. 15. Given the undeniable relevance of that

information to Bloom's subjective claims of a disabling seizure disorder, the Court should find that Hartford Life's use of surveillance was sensible and appropriate.

> (2) *Hartford Life's Failure to Discuss Bloom's Social Security Disability Award is Irrelevant to the Reasonableness of Hartford Life's Decision.*

Bloom next argues that Hartford Life's decision was biased because the company failed to insert into its benefits termination letter language required by its claims manual with respect to her award of disability benefits from the Social Security Administration ("SSA"). Initial Br., pg. 35-36. Contrary to Bloom's assertions, an ERISA administrator's failure to discuss a claimant's SSA award "does not make [the administrator's] decision wrong or even unreasonable." *Herman v. Met. Life Ins. Co.*, 689 F. Supp.2d 1316, 1326 (M.D. Fla. 2010). This is because the "legal principles controlling the Social Security [disability] analysis are different from those governing the ERISA analysis." *Id.* For example, whereas a "treating physician's opinion is given priority in the Social Security context, the same is not true in the ERISA context." *Id.* SSA determinations are therefore "not persuasive in ERISA benefits cases." *Richards v. Hartford Life and Acc. Ins. Co.*, 356 F. Supp.2d 1278, 1289 (S.D. Fla. 2004), *aff'd*, 153 Fed.Appx. 694 (11th Cir. 2005). Indeed, district courts in the Eleventh Circuit are not even required to consider (let alone follow) Social Security disability awards in ERISA cases. *See Whatley v. CNA Ins. Co.*, 189 F.3d 1310, 1314 n.8 (11th Cir. 1999)

(stating that a district court "*may* consider the Social Security Administration's determination of disability" in an ERISA case) (emphasis added); *Ruple v. Hartford Life and Acc. Ins. Co.*, 340 Fed.Appx. 604, 2009 WL 2434999 (11th Cir., Aug. 11, 2009), **7 (although a district court "may" consider an SSA award in reviewing an ERISA benefits decision, it is "not bound to do so").

While Bloom faults Hartford Life for failing to discuss her SSA award, there was in fact nothing to discuss, because Hartford Life was not provided any information concerning the basis for the award. Instead, Hartford Life was given only a letter from the SSA advising that Plaintiff had been awarded SSA benefits and stating the monthly amount of benefits. Doc. 43-4, pg. 66-69. In this circumstance, it would be especially inappropriate to penalize Hartford Life for failing to discuss the SSA award.

*Iannello v. Hartford Life and Acc. Ins. Co.*, 2013 WL 262235 (2d Cir., Jan. 24, 2013), is on point. Like Bloom, the plaintiff in *Iannello* argued that the ERISA claim administrator had "failed to consider the decision of the [SSA] to award her benefits." *Id*. at *2. Noting that an SSA award is "by no means determinative of a claimant's eligibility under an ERISA plan," the Second Circuit ruled that "in this case the SSA award bears even less on whether Hartford abused its discretion," because the only documentation provided to the administrator was a "letter from the SSA confirming the amount of disability benefits she received each month."

*Id.* Given the absence of "documents that reveal the basis of the SSA's determination," the court concluded that it "**cannot fault Hartford for failing to discuss the award in its decision denying coverage**." *Id.* (emphasis added). This Court should agree with the Second Circuit and hold that Hartford Life's failure to discuss Bloom's SSA award in no way rendered Hartford Life's benefits decision arbitrary and capricious. *See also Roberts v. Am. Elec. Power LTD Plan*, 2010 WL 2854299, *12 (S.D. W.Va., July 19, 2010) (ruling that without an "explanation of why Social Security benefits were granted," an ERISA claim administrator "cannot properly evaluate and weigh the [SSA's] decision," and therefore, the claim administrator's "failure to give significant consideration to the award of Social Security Disability benefits" was "not an abuse of discretion").

> (3) *No Perfection Statement Was Needed Under the Claims Manual.*

Bloom asserts that Hartford Life's claims manual required it to issue a "perfection statement" telling her what evidence to submit in support of her claim. Initial Br., pg. 37-38. As noted previously, the manual is not a plan document and is not binding. Nonetheless, Bloom's reliance on the language of the manual is misplaced. In reality, the manual only gives guidance in a situation where the basis of a claim denial is the claimant's failure to submit a specific element of "proof of loss" that Hartford Life "requested, but did not receive." Doc. 46, Exh. W, pg. H-582. Bloom does not contend that the termination of benefits in this case

was occasioned by her failure to submit evidence requested by Hartford Life, and her argument concerning a "perfection statement" is thus a red herring.[8]

Finally, Bloom's assertion that Hartford Life required "neuropsychological testing to support her cognitive deficits," Initial Br. at pg. 37, is unsupported by the record. There was no such requirement. While neuropsychological testing may provide objective evidence of cognitive deficits in some instances, it was unlikely to have done so in the instant case for reasons explained later in this Brief. *See* pg. 53-54, *infra*.

### IV. Bloom's Alternative Request for a Remand to Hartford Life Lacks Merit.

Bloom alternatively seeks reversal and remand based on Hartford Life's failure to create or obtain evidence which, she speculates, might have supported her claim. Initial Br., pg. 13-16, 37-38. Specifically, Bloom bases her request for a remand on Hartford Life's failure to: (a) obtain a single EEG test of unclear significance that was mentioned in a physician's letter but not submitted to Hartford Life; and (b) have Bloom undergo formal neuropsychological testing in order to create new evidence. *Id.* In seeking a remand on those grounds, Bloom relies on *Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792 (10th Cir. 2004), which she

---

[8] The inapplicability of the claims manual's "perfection statement" provision was correctly explained by the district court, on the same ground stated above. Doc. 79, pg. 26.

invites this Court to follow.  Initial Br., pg. 21-26.  Her invitation should be declined, as *Gaither* is readily distinguishable for multiple reasons.

The plaintiff in *Gaither* was a cancer patient who continued to work while battling the disease, until his employer suspended him because his use of narcotic painkillers "made him unable to perform his job."  *Gaither*, 394 F.3d at 794-95.  Although the plaintiff's "uncontroverted use of painkillers" was an "independent ground for disability presented in the record and specifically raised in [plaintiff's] administrative appeal," the claim administrator focused solely on whether the plaintiff was psychologically disabled and gave no consideration to the possibility of a disability caused by narcotic use.  *Id*. at 806.  In other words, the administrator denied the plaintiff's claim of a narcotics-based disability "without specifically considering the claim at all."  *Id*.  Noting the administrator's failure to even inquire about the reason for the plaintiff's suspension, and finding that the administrator had "no adequate grounds for denying the narcotics-based disability claim," the Tenth Circuit deemed the benefits decision arbitrary and capricious.  *Id*. at 806-807, 806 n.5.  The court therefore ordered a remand to the administrator for further review of the plaintiff's eligibility for benefits.  *Id*. at 809.

*Gaither*, as the Tenth Circuit was careful to state, stands only for the "narrow principle" that administrators cannot "shut their eyes" to "readily available information" when the evidence in the record suggests that the

information "might confirm the beneficiary's theory of entitlement," and the administrator has "little or no evidence in the record to refute that theory." *Id*. at 807. *Gaither* thus contemplates a three-part test for imposing a duty of inquiry on a claim administrator with respect to information not submitted by a claimant: (a) the information must be readily available; (b) there must be evidence in the record indicating that the information might confirm the claimant's theory of entitlement to benefits; *and* (c) there must be little or no evidence in the record to refute the claimant's theory of entitlement to benefits.

As demonstrated below, *Gaither* is wholly inapposite. First, to the extent that *Gaither* places any burden on an administrator to obtain information in support of a disability claim, it is contrary to the terms of the Policy, which this Court is required to enforce under Eleventh Circuit precedent. (As discussed below, the policy in *Gaither* was critically different from the Policy here.) Furthermore, the lone EEG test and the prospective neuropsychological testing cited by Bloom do not satisfy *Gaither*'s exacting three-part standard for imposing a duty of inquiry on a claim administrator.

A.  <u>The Policy Obligated Bloom to Submit Evidence Establishing Her Claimed Eligibility for Benefits, and Did Not Require Hartford Life to Create or Obtain Evidence to Support Her Claim.</u>

As stated previously, it is a bedrock principle of ERISA law that plans are to be administered and benefits paid "in accordance with plan documents." *Clark,*

*supra* pg. 37, at **2. Here, the governing plan document (*i.e.*, the Policy) conditions benefits on the claimant's submission of "Proof of Loss" to Hartford Life, with Proof of Loss defined as documentation of the claimed disability. Doc. 43-1, pg. 21, 25-26. The Policy further provides that: (a) benefits will cease if the claimant fails to furnish continuing Proof of Loss; and (b) all proof submitted must be satisfactory to Hartford Life. *Id*., pg. 23, 26. Under these unambiguous plan terms, the "burden clearly rests with the claimant to present sufficient medical evidence to support his claim of disability." *Trantham v. Hartford Life and Acc. Ins. Co.*, 2010 WL 5491197, *5 (E.D. Mich., Nov. 3, 2010) (construing similar Hartford Life policy requiring claimant's submission of "proof of loss" satisfactory to Hartford Life). Bloom's burden of presenting proof of her claimed disability to Hartford Life was recognized by the district court, which correctly noted that "under the plan, Bloom's benefits are contingent on her continuing proof of disability." Doc. 79, pg. 16.

To the extent that *Gaither* (or any other non-binding authority) would place any obligation on Hartford Life to obtain information in support of Bloom's claim, it is inconsistent with the clear terms of the Policy as outlined above. Under this Court's precedent, a court reviewing an ERISA benefits decision is required to "give effect to the unambiguous language of the policy." *Arnold v. Life Ins. Co. of N. Am.*, 894 F.2d 1566, 1567 (11th Cir. 1989). *See also Johnson Controls, Inc. v.*

*Flaherty*, 408 Fed.Appx. 312, 2011 WL 135745 (11th Cir., Jan 18, 2011), **1 (when terms of an ERISA plan document are unambiguous, courts must "enforce them as written"). In other words, the Court may not impose obligations on Hartford Life -- such as a duty to gather or create evidence in support of Bloom's claim -- which are at variance with the terms of the Policy. *See Muzyka v. UNUM Life Ins. Co. of Am.*, 195 Fed.Appx. 904, 2006 WL 2613726 (11th Cir., Sept. 13, 2006), **5 (11th Cir., Sept. 13, 2006) (rejecting plaintiff's contention that administrator was required to have her examined and/or contact her treating physician where plaintiff failed to "identify any provision in the Plan obligating [administrator] to take any of these measures"); *Kiloh v. Hartford Life Ins. Co.*, 2005 WL 2105957, *10, 10 n.4 (M.D. Fla., Aug. 31, 2005) (ruling that plaintiff was "incorrectly attempting to shift the burden to Defendant to discover and obtain all relevant medical records," and noting that Hartford Life's policy placed the "burden on Plaintiff to provide Defendant with satisfactory proof of continued disability"); *Walker v. Kimberly-Clark Corp.*, 2010 WL 611007, *7 (N.D. Miss., Feb. 17, 2010) (rejecting plaintiff's contention that administrator was obligated to "request medical documentation from Plaintiff's treating physicians" where there was "no language in the Plan that obliges the Plan Administrator to investigate or relieves the claimant of the burden to establish entitlement to benefits"). Under the terms of the Policy, which must be given effect, Hartford Life was simply "not

obligated to conduct testing or gather evidence additional to that which was submitted" by Bloom. *Wright v. Hartford Ben. Mgt. Svcs.*, 2012 WL 1680094, \*7 (D.N.J., May 11, 2012).

Notably, when the *Gaither* court rejected the administrator's argument that it had no duty to obtain evidence under any circumstances, the court looked to the "terms of the plan itself," which provided that benefits would cease if the claimant failed to present "sufficient medical evidence *requested by the Administrative Services Provider*." *Gaither*, 394 F.3d at 804-05 (emphasis in original). Thus, the decision in *Gaither* depended in part on the specific terms of the plan at issue, which were materially different from those of the plan at issue here. Unlike the plan in *Gaither*, the Policy expressly conditioned eligibility for continued benefits on the claimant's submission of proof that was satisfactory to Hartford Life, without obligating Hartford Life to request evidence. *See* pg. 46, *supra*. In view of the Policy's plain language, Bloom's reliance on *Gaither* is clearly misplaced.

B.    <u>Bloom Fails to Establish the Elements of the Three-Part Gaither Test</u>.

Even if the Policy and the *Gaither* plan contained the same language, *Gaither* would still be unavailing to Bloom.

As to Bloom's contention that Hartford Life should have directed her to undergo neuropsychological testing, the mere possibility of creating evidence through testing does not constitute "readily available information" under *Gaither*.

*Gaither* concerned information then in existence, and no court has ever construed it as imposing an obligation to conduct testing or have a claimant evaluated in order to generate new disability evidence. On the contrary, a district court in the Tenth Circuit has specifically ruled that *Gaither* does *not* require an administrator to have a claimant evaluated in any manner not required by the plan. In *Whitfield v. Lincoln Nat. Life Ins. Co.*, 2011 WL 4607224 (N.D. Okla., Sept. 30, 2011), the plaintiff cited *Gaither* in contending that the administrator "should have ordered him to undergo a functional capacity evaluation," which allegedly would have "definitively shown whether he was capable of performing work duties in his occupation." *Id.* at *9. Noting that the claimant (like Bloom) had the "burden of submitting proof of continuing disability" under the terms of the applicable policy, the court deemed *Gaither* "distinguishable" because the mere "*potential* that a functional capacity evaluation could be completed is not the equivalent of 'readily available information.'" *Id.* at *9, *9 n.9 (emphasis in original). This Court should agree.

Even assuming for the sake of argument that neuropsychological testing and the EEG test both constituted readily available information, neither warrants a remand under the second and third factors of the *Gaither* test. Bloom's theory of entitlement to LTD benefits is that she allegedly experienced "frequent and incapacitating seizures" that precluded her from working. Initial Br., pg. 27.

According to Bloom, these seizures were "incapacitating for their duration" and "accompanied by lingering physical and cognitive deficits." *Id.*, pg. 4. Unlike the administrator in *Gaither*, Hartford Life gave specific and thorough consideration to Bloom's theory, concluding in its final denial letter that the evidence did not establish the "severity and frequency of your reported seizure disorder and cognitive impairment." Doc. 43-1, pg. 50.

Bloom's sole attempt to demonstrate the purported significance of the alleged EEG test consists of a citation to a statement by Dr. Grossman, the independent examining physician, indicating that he could not agree with Dr. Schiftan's diagnosis of a seizure disorder absent objective evidence of seizures. Initial Br., pg. 14; Doc. 43-3, pg. 49. But Bloom's theory that the EEG test might have altered Dr. Grossman's opinion of Dr. Schiftan's diagnosis is purely speculative, particularly when considered in light of Dr. Schiftan's letter referencing the test.

While Bloom contends that Hartford Life should have decided that the EEG test referenced in Dr. Schiftan's letter was significant, it is telling that Dr. Schiftan himself (in the words of the district court) "did not ascribe any particular significance" to the test. Doc. 79, pg. 19. Dr. Schiftan's entire discussion of the EEG test was contained in one sentence in the following paragraph:

> As part of evaluation of her stroke she has hypercoagulable state and found to have MTHFR

> coagulation abnormality and associated low B12 and elevated homocystine level.  In addition, her ambulatory EEG was abnormal.

Doc. 43-3, pg. 43.  As the Court can see, Dr. Schiftan offered no opinion about the significance of this single EEG test and provided no information about it other than to say it was abnormal.  He did not opine that the EEG test was evidence of anything, let alone disability.  He did not indicate that it was evidence of a seizure, and he certainly did not suggest that a single EEG test demonstrated chronic seizures of disabling frequency and severity during the relevant time period.  (Indeed, Dr. Schiftan did not even identify the year in which the alleged EEG test was performed.)  Nor did he provide to Hartford Life any report of the allegedly abnormal EEG.

Although Hartford Life was "not obligated to contact Plaintiff's treating physicians for more information," *Bates v. Met. Life Ins. Co.*, 2009 WL 2355834, *17 (M.D. Ga., July 27, 2009), Hartford Life notes that it *did* in fact attempt to obtain more information from Dr. Schiftan during its appeal review subsequent to its receipt of his letter.  At Hartford Life's request, Dr. Engstrand made numerous attempts to contact Dr. Schiftan to consult with him about Bloom's condition.  Doc. 43-3, pg. 8-9.  Dr. Engstrand in fact called Dr. Schiftan's office no fewer than ten times in the space of a week, but her calls were (as she reported to Hartford Life) "never returned."  *Id.*, pg. 8.  Given Dr. Schiftan's failure to respond,

Hartford Life acted reasonably in completing its evaluation based on the information provided to it.[9]  *See Hunley v. Hartford Life and Acc. Ins. Co.*, 712 F. Supp.2d 1271, 1278, 1283-84 (M.D. Fla. 2010) (affirming benefits denial where consulting physician "made several attempts to contact [plaintiff's] treating physicians, but they never returned his calls").

Even assuming that the lone EEG test might have had some diagnostic significance -- an assumption that is unsupported by record evidence and is purely speculative[10] -- it is well settled that a "medical diagnosis by itself does not establish a disability" for ERISA purposes.  *Jordan v. Northrop Grumman Corp.*, 370 F.3d 869, 880 (9th Cir. 2003).[11]  Bloom makes no attempt to argue that a single EEG test would or could have demonstrated that she experienced seizures with such frequency and severity as to preclude her from working.  Her hypothesis that this one test might have confirmed her entitlement to benefits -- as required to merit consideration under *Gaither* -- is therefore untenable.

---

[9]     The inapplicability of the claims manual's "perfection statement" provision was correctly explained by the district court, on the same ground stated above. Doc. 79, pg. 26.

[10]     The alleged EEG could have been abnormal for any number of non-diagnostic reasons, which would explain why Dr. Schiftan placed no particular emphasis on it.

[11]     As the Ninth Circuit aptly observed in *Jordan*, medical treatises describe "conditions from amblyopia to zoolognia that do not necessarily prevent people from working." *Id.*

Equally untenable is Bloom's insistence that neuropsychological testing would have confirmed her theory of disability. According to Bloom, she is impaired only when experiencing a seizure and for some unspecified period of time thereafter. Initial Br., pg. 4, 20-21. Therefore, for testing to be even theoretically meaningful under her theory, it would have to be conducted within some unknown period of time after she had a seizure. Bloom also advises that she may go days without a seizure and that her seizures are predictable only a few minutes before they occur. *Id.,* pg. 4, 22. As a practical matter, this uncertainty is highly problematic given that such testing must obviously be scheduled in advance. If, for example, Bloom had undergone neuropsychological testing at the time the surveillance was conducted, the results would have been normal because Bloom concedes that she had no seizures and therefore was not impaired during that two-day period. *Id.*, pg. 21-22. The testing would, in other words, have been pointless under Bloom's theory of disability. Bloom does not explain how neuropsychological testing could be arranged in a way that would catch her at the "right time" to support her claim. Clearly it would not be feasible to repeatedly test her until she happened to have a seizure during or shortly before the testing, or to keep a neuropsychologist on indefinite standby waiting for a seizure to occur.

Even if these practical difficulties could somehow be surmounted, such testing would not provide adequate evidence of disability. As the district court

aptly pointed out, the "mere possibility that such testing would reveal neurological seizure activity" on a given occasion would not "prove that those seizures would be of such frequency and severity to render [Bloom] disabled." Doc. 79, pg. 20. For all of these reasons, the Court should conclude that Bloom fails to demonstrate a sufficient likelihood that testing would confirm her theory of entitlement to benefits, as required under *Gaither*.

The third necessary *Gaither* factor -- the absence of evidence refuting the claimant's theory of entitlement to benefits -- is clearly not met here, as the Administrative Record is replete with evidence that (a) Bloom did not have seizures, and (b) any seizures she may have experienced were not so frequent and severe as to be disabling. First and foremost is the undisputed fact that while Bloom claimed to have chronic seizures, none was ever observed by a medical professional and none occurred during a randomly selected two-day period. *See* pg. 23-27, *supra*. Bloom's claim of frequent, incapacitating seizures is severely undermined by the documented evidence of her extensive driving. *See* pg. 27-30, *supra*. An independent reviewing neurologist and an independent medical examiner each determined that Bloom had no functional impairment and was fully capable of working. *See* pg. 31-32, *supra*. As the district court correctly recognized, Hartford Life had "objective, reliable evidence rebut[ting] Bloom's claim of disability, i.e., medical examinations and reports indicating no

neurological abnormality or cognitive impairment." Doc. 79, pg. 26. Accordingly, this case could scarcely be more different from *Gaither*. *See Whitfield*, *supra* pg. 50, at *9 n.9 (distinguishing *Gaither* on the ground that the administrator in *Whitfield* had "significant evidence to refute Plaintiff's theory of disability, including the independent medical evaluations").

If Bloom believed that the evidence she now wants created and/or considered was necessary for Hartford Life to "make a proper benefits determination," Bloom "should have obtained this evidence and submitted it" to Hartford Life. *Davidson v. Prudential Ins. Co. of Am.*, 953 F.2d 1093, 1095 (8th Cir. 1992) (affirming district court's denial of plaintiff's request for remand to administrator for consideration of additional evidence). Having failed to do so, her request for a remand amounts to "nothing more than a last-gasp attempt to quarrel" with Hartford Life's determination. *Id.*

Hartford Life further notes that *Davidson* has been cited with approval by this Court, which held that *Davidson*'s "persuasive" reasoning should "apply with equal force" to both claimants and administrators in disability cases. *Levinson v. Reliance Standard Life Ins. Co.*, 245 F.3d 1321, 1328 (11th Cir. 2001) (affirming district court's refusal of administrator's request for remand to consider additional evidence). *See also Ray v. Sun Life & Health Ins. Co.*, 752 F. Supp.2d 1229, 1234 (N.D. Ala. 2010), *aff'd*, 443 Fed.Appx. 529, 2011 WL 2025539 (11th Cir., Oct. 21,

2011) (citing *Levinson* and *Davidson* as authority for denying plaintiff's request for remand to administrator for consideration of "additional documents" pertaining to disability claim).

Bloom's request for a remand under *Gaither* is premised on the contention that Hartford Life had an obligation to obtain or create evidence to support her claim. Her contention is meritless in view of the plain Policy text assigning that obligation solely to her. Here, unlike in *Gaither*, there was an abundance of evidence weighing against Bloom's theory of disability. The Court should therefore decline to remand Bloom's claim to Hartford Life under the authority of *Gaither*. Instead, it should agree with the district court that Hartford Life's benefits decision was not wrong and certainly not unreasonable, and affirm the decision below as required by Eleventh Circuit law.

## CONCLUSION

For the reasons stated above, the judgment of the district court should be affirmed.

Respectfully submitted,

<div style="margin-left:40%">

s./Jerel C. Dawson
SHUTTS & BOWEN LLP
Counsel for Appellee
William J. Gallwey, III, Esquire
Florida Bar No. 199133
Jonathan M. Fordin, Esquire
Florida Bar No.: 371637
Jerel C. Dawson, Esquire
Florida Bar No. 152390
1500 Miami Center
201 South Biscayne Boulevard
Miami, Florida 33131
Telephone: 305-358-6300
Facsimile: 305-347-7839

</div>

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)

This brief complies with the type volume limitations of Fed. R. App. P. 32(a)(7)(B) because:

This brief contains 13,143 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), and

This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2002 in 14 point New Times Roman type that complies with the type-volume requirements of Fed. R. App. P. 32(a)(7).

<div style="margin-left:40%">

s./Jerel C. Dawson
Jerel C. Dawson
Counsel for Appellee

</div>

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 7th day of June, 2013, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following: **Brenton N. Ver Ploeg, Esquire and Benjamin Hassebrock, Esquire,** VER PLOEG & LUMPKIN, P.A., 100 S.E. Second Street, 30th Floor, Miami, FL 33131.

s./Jerel C. Dawson
Jerel C. Dawson
Counsel for Appellee

MIADOCS 7768012 1